Bryan J. Freedman, Esq.  (SBN 151990)
Miles M. Cooley, Esq. (SBN 206783)
Jason H. Sunshine, Esq. (SBN 336062)
FREEDMAN TAITELMAN + COOLEY, LLP
1801 Century Park West, 5th Floor
Los Angeles, California 90067
Tel.: (310) 201-0005
Fax: (310) 201-0045
bfreedman@ftlllp.com
mcooley@ftlllp.com
jsushine@ftlllp.com

*Attorneys for Plaintiff Jane Doe*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| JANE DOE,<br><br>           Plaintiff,<br><br>   v.<br><br>TRADESHIFT, INC., a Delaware corporation, TRADESHIFT HOLDINGS INC., a Delaware corporation, CHRISTIAN LANNG, an individual, MIKKEL HIPPE BRUN, an individual, GERT SYLVEST, an individual, MORTEN LUND, an individual, MORTEN SONDERGAARD aka MORTEN PEDERSEN and aka MORTEN BLINKSBJERG NIELSEN, JEFF RANSDELL, an individual, KING & SPALDING INTERNATIONAL a United Kingdom business entity, LITTLER MENDELSON, P.C., a California professional corporation, HSBC HOLDINGS Plc, a United Kingdom business entity, KOCH INDUSTRIES, INC., a Delaware corporation, and DOES 1-100, inclusive,<br><br>           Defendants. | Case No.: 4:24-cv-00166-JST<br><br>**PLAINTIFF JANE DOES'S OPPOSITION TO DEFENDANTS TRADESHIFT, INC.'S AND TRADESHIFT HOLDINGS INC.'S MOTION TO COMPEL ARBITRATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>*[Filed concurrently with Declaration of Jane Doe]*<br><br>Date: April 18, 2024<br>Time: 2:00 p.m.<br>Crtrm.: 6<br><br>Assigned to Hon. Jon S. Tigar |

## **TABLE OF CONTENTS**

Contents

I.      INTRODUCTION………………………………………………...1

II.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY……...……….2

     A.      Plaintiff's Employment at Tradeshift……………………………..2

          1. The Slave Contract ..………………………………………2

          2. Tradeshift Covers Up Plaintiff's Mistreatment and Abuse……………3

     B.      Lanng and Tradeshift Craft an Illegal Settlement Agreement………..…4

     C.      The Instant Action ………………………………………….………...6

III.    ARGUMENT………………………………..…………………....6

     A.      The Employment Agreement Is Not a Valid Agreement to Arbitrate

Plaintiff's Claims …………………………………………………...…………6

          1.      The Slave Contract, Not the Employment Agreement, Governed the

Terms of Plaintiff's Employment…………………………………6

          2.      Tradeshift Holdings Is Not Party to the Employment Agreement's

Arbitration Provision…………………………………………...7

          3.      The Settlement Agreement Superseded the Earlier Agreements…….8

     B.      The Settlement Agreement Is Not a Valid Agreement to Arbitrate………9

          1.      The Settlement Agreement Is Tainted by An Illegal Purpose and

Violative of Public Policy………………………………………9

          2.      The Settlement Agreement's Confidentiality and Non-Disparagement

Provisions Are Unlawful…………………………………………10

          3.      The Settlement Agreement's Arbitration Provision Is Unlawful…...12

     C.      The Settlement Agreement Is Void for Fraud in the Execution…………12

     D.      The Settlement Agreement's Arbitration Provision Is Unconscionable....13

          1.      The Arbitration Provision Is Procedurally Unconscionable……….. 14

          2.      The Arbitration Provision Is Substantively Unconscionable……….14

i

E.      The Court Should Refuse to Enforce the Purported Arbitration Agreement(s) Pursuant to Cal. Code Civ. Proc § 1281.2(c)……………………..14

F.      If the Court Is Inclined to Grant the Motion, It Should Hold an Evidentiary Hearing Before Compelling Arbitration…………………………………………15

IV.     CONCLUSION…………………………………………………………………..15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Armendariz v. Foundation Health Psychcare Services, Inc.*,
    24 Cal.4th 83 (2000) ................................................................. 9, 10, 13

*Ashburn v. AIG Financial Advisors, Inc.*,
    234 Cal.App.4th 79 (2015) ................................................................. 15

*Baltazar v. Forever 21, Inc.*,
    62 Cal.4th 1237 (2016) ................................................................. 13

*Brown v. Wells Fargo Bank, N.A.*,
    168 Cal.App.4th 938 (2008) ................................................................. 12, 15

*Carbajal v. CWPSC, Inc.*,
    245 Cal.App.4th 227 (2016) ................................................................. 14

*Fitzhugh v. Granada Healthcare & Rehabilitation Center, LLC*,
    150 Cal.App.4th 469 (2007) ................................................................. 15

*Hotels Nevada v. L.A. Pacific Center, Inc.*,
    144 Cal.App.4th 754 (2006) ................................................................. 12, 15

*Knutson v. Sirius XM Radio Inc.*,
    771 F.3d 559 (9th Cir. 2014) ................................................................. 7

*Marathon Entertainment, Inc. v. Blasi*,
    42 Cal.4th 974 (2008) ................................................................. 9

*Meeks v. Experian Info. Sols., Inc.*,
    No. 21-cv-03266-VC, 2021 WL 5149066 (N.D. Cal. Nov. 5, 2021) ...................................... 7

*Poublon v. C.H. Robinson Company*,
    846 F.3d 1251 (9th Cir. 2008) ................................................................. 9

*Rosenthal v. Great Western Fin. Securities Corp.*,
    14 Cal.4th 394 (1996) ................................................................. 12, 13, 15

*Saint Agnes Med. Ctr. v. PacifiCare of Cal.*,
    31 Cal.4th 1187 (2003) ................................................................. 12

**Statutes**

Cal. Code Civ. Proc § 1281.2(c) ................................................................. 14

Cal. Code Civ. Proc. § 1670.5 ................................................................. 13

Cal. Gov't Code § 12964.5(b)(1)(A) .................................................................................... 11

Cal. Gov't Code § 12964.5(b)(1)(B) .................................................................................... 11

Cal Gov't Code § 12964.5(b)(2) ......................................................................................... 11

Cal. Gov't Code § 12964.5(c) ............................................................................................. 11

Cal. Code Civ. Proc. § 1670.11 .......................................................................................... 11

Cal. Code Civ. Proc. § 12964.5 .......................................................................................... 11

Cal. Code Civ. Proc. § 52.5 .................................................................................................. 6

18 U.S.C. § 1595 ................................................................................................................... 6

PLAINTIFF JANE DOE'S OPPOSITION TO DEFENDANTS TRADESHIFT, INC. AND TRADESHIFT
HOLDINGS INC.'S MOTION TO COMPEL ARBITRATION

1

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

2

**I.    <u>INTRODUCTION</u>**

3

Defendants Tradeshift, Inc.'s ("Tradeshift") and Tradeshift Holdings Inc.'s ("Tradeshift

4

Holdings") (together, "Defendants") motion to compel arbitration ("Motion") of Plaintiff's

5

claims against them must be denied.

6

This is no ordinary case. Plaintiff is the former executive assistant to Tradeshift's

7

founder and former CEO, Christian Lanng, who forced her to sign a Slave Contract, trafficked

8

her around the world, and subjected her to years of physical and sexual abuse. As a result of her

9

grotesque mistreatment, Plaintiff was bedridden and unable to function for nearly 5 years. She

10

still bears the enormous trauma and physical scars from her time as a sex slave. Tradeshift's

11

senior management and board of directors were fully aware of Lanng's actions, ratified them,

12

and covered them up. In fact, two of Tradeshift's board members engaged in their own acts of

13

sexual violence against Plaintiff.

14

In support of their Motion, Defendants allege that Plaintiff is party to two separate

15

agreements to arbitrate. Mot. at 1:3-11. First, there is an employment agreement (the

16

"Employment Agreement") that Plaintiff and Tradeshift entered into when Plaintiff was hired in

17

2014. Second, there is a settlement agreement ("Settlement Agreement") between Plaintiff and

18

Defendant Christian Lanng to which Tradeshift contends it is an intended third-party

19

beneficiary. Neither provides a valid basis to compel arbitration.

20

The Slave Contract, not the Employment Agreement, was the operative document

21

governing the terms and conditions of Plaintiff's employment. It was Lanng's intention and

22

Plaintiff's belief that the Slave Contract, which was signed by Tradeshift's CEO and contained

23

no arbitration provision, superseded her earlier onboarding documents. With respect to the

24

Employment Agreement, Tradeshift Holdings is not even a party. Absent some evidence (which

25

it has not presented) that it is an affiliated entity covered by the Employment Agreement,

26

Tradeshift Holdings cannot enforce its arbitration provision. Nor can Tradeshift, as this dispute

27

was folded into the fraudulent and unconscionable Settlement Agreement, which superseded the

28

Employment Agreement in relation to Plaintiff's claims. But the Settlement Agreement, to

1

PLAINTIFF JANE DOE'S OPPOSITION TO DEFENDANTS TRADESHIFT, INC. AND TRADESHIFT
HOLDINGS INC.'S MOTION TO COMPEL ARBITRATION
Case No.: 4:24-cv-00166-JST

1   which Tradeshift is not even a party is itself tainted by an illegal purpose, violative of public

2   policy, and the product of a scheme by Tradeshift to evade California employment laws,

3   unjustifiably absolve itself of risk, and silence Plaintiff forever. Tradeshift has not paid not a

4   dime of consideration for the right it now invokes, namely to further victimize Plaintiff, separate

5   itself from its co-conspirators, and foreclose Plaintiff's ability to attain any measure of justice.

6         Since there is no valid agreement upon which to compel arbitration of Plaintiff's claims,

7   Defendants' Motion must be denied.

8   **II.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

9         **A.    Plaintiff's Employment at Tradeshift**

10         Tradeshift is a cloud-based supply chain platform founded in 2010 by Christian Lanng,

11   Mikkel Hippe Brun, and Gert Sylvest with its headquarters located in San Francisco, California.

12   FAC ¶ 27. Plaintiff was hired by Tradeshift in January 2014 to serve as an executive assistant to

13   founder and CEO Christian Lanng. FAC ¶ 54; Declaration of Jane Doe ("Doe Decl.") ¶ 3.

14         **1.    The Slave Contract**

15         Shortly after the commencement of her employment, Plaintiff was forced to sign a so-

16   called "Slave Contract," which referred to her as a "Slave" and Lanng as the "Master." FAC ¶¶

17   1-6; Doe Decl. ¶ 4, Ex. A. The Slave Contract required Plaintiff to submit to harmful and

18   degrading practices, including sexual abuse and physical punishment. *Id.*; FAC ¶ 58. Plaintiff

19   was scared of Lanng and fearful of losing what she believed to be her dream job if she did not

20   assent. Doe Decl. ¶ 4. As a result, she signed the Slave Contract, as did Lanng. *Id.*; FAC ¶ 56.

21         Under the terms of the Slave Contract, Plaintiff was Lanng's "full property with no

22   rights, outside what is outlined in [the Slave Contract]" and her body and all her possessions,

23   "including all assets, finances, online accounts and material goods" belonged to Lanng "to be

24   used as seen fit[.]" Doe Decl. ¶ 4, Ex. A. It further provided that she "now exist[s] solely for the

25   pleasure of [Lanng]." *Id.*

26         The Slave Contract also set the parameters of Plaintiff's employment at Tradeshift. Doe

27   Decl. ¶¶ 6-8. It set forth her role ("to please [Lanng] and for no other reason"), her attendance

28   requirements ("6 hours in the office every day"), her workplace attire ("as feminine as possible,

1   preferably in dresses or skirts"), her professional development ("learn at least one new thing

2   every week that increase [sic] [her] function"), and the code of conduct ("never challenge,

3   humiliate or raise [her] voice in the presence of [Lang] and . . . keep proper business etiquette

4   for an EA working for her CEO"). Doe Decl. ¶ 4, Ex. A.

5          The Slave Contract was the operative document governing her employment at Tradeshift

6   regardless of any earlier agreements she may have signed. Doe Decl. ¶ 7. Lanng, as CEO, was

7   very clear about this, as were the terms of the Slave Contract itself. Plaintiff acted according to

8   this understanding. *Id.* She also had to comply with Lanng's directives for her own safety

9   because Lanng would not countenance violations of the Slave Contract and would punish her

10  severely for disobedience, including with paddling, whipping, clamps, hot wax, electricity, and

11  other horrific forms of abuse. *Id.* ¶ 8.

12         In the years that followed, Plaintiff was subjected to routine sexual, physical, and

13  psychological abuse at the hands of Lanng, including being bound against her will, penetrated

14  with various inanimate objects, and beaten to the point of bleeding. Doe Decl. ¶ 9; FAC ¶¶ 56-

15  62. She lost all sense of identity and purpose and fell into an extreme depression. Doe Decl. ¶ 9.

16  During the same period, she was trafficked for sexual purposes around the world, including to

17  China, India, Singapore, Japan, and the United Kingdom. *Id.* ¶ 10; FAC ¶ 59. These trips were

18  invariably under the guise of and paid for by Tradeshift. Doe Decl. ¶ 10; FAC ¶¶ 59, 62.

19                **2.      Tradeshift Covers Up Plaintiff's Mistreatment and Abuse**

20         Plaintiff's treatment was well-known to top Tradeshift executives and members of the

21  board. Doe Decl. ¶ 11; FAC ¶¶ 65-71. In fact, two members of the board, Morten Lund and

22  Morten Sondergaard, committed their own acts of sexual violence against her. Doe Decl. ¶ 11.

23  When she attempted to stand up for herself or resist her mistreatment, she was subjected to a

24  battery of adverse employment actions intended to isolate and humiliate her. *Id.* ¶ 12. When she

25  dared rebuff Lanng's advances, Tradeshift created new layers of bureaucracy to surveil her

26  every move, stifle her job performance, and wear her down mentally. *Id.* For example, on

27  several work trips, she arrived at her destination to find that Tradeshift or Lanng had canceled

28  her hotel reservations or disconnected her corporate credit card. *Id.*

By 2017, Plaintiff had disclosed her mistreatment and abuse to a variety of Tradeshift executives and board members, including several individuals in human resources and Tradeshift's two other co-founders, Mikkel Hippe Brun and Gert Sylvest. *Id.* ¶ 13. Every one of her attempts to find a safe harbor found its way back to Lanng, who taunted her and boasted that there was nowhere safe for her to go. *Id.* Tradeshift took no action of any kind in response to her disclosures. *Id.*

In or around 2017, Plaintiff started receiving treatment from a psychiatrist and taking medication to address her rapidly escalating depression and post-traumatic stress disorder, but she remained in a dire mental state for several years. *Id.* ¶ 14. On or about October 31, 2019, however, Plaintiff's health insurance stopped working, and she lost access to her work email and benefits portal. *Id.* ¶ 15. In response, she contacted Sequoia, Tradeshift's insurance broker, to inform them of her situation and the circumstances surrounding the discontinuation of her coverage. *Id.* She also emailed and called various Tradeshift employees to inquire about her loss of insurance coverage and access to company systems. *Id.* On or about December 26, 2019, Plaintiff sent an email to Tradeshift board members, putting them on certain notice of Lanng's egregious misconduct and her journey through hell. *Id.* ¶ 16. After sending the email to Tradeshift's board, Plaintiff's insurance was inexplicably re-activated but Tradeshift stopped paying her. *Id.* As a result, she was forced to liquidate her savings, including valuable cryptocurrency, to meet her basic needs. *Id.*

On or about May 30, 2020, Tradeshift terminated Plaintiff as part of a purported 'restructuring.' *Id.* ¶ 17. It was clear, however, that she was actually terminated because Tradeshift wanted to raise capital and protect Lanng, and Plaintiff had become too much of a problem. *Id.*

### B.   Lanng and Tradeshift Craft an Illegal Settlement Agreement

In 2022, Plaintiff retained a law firm to pursue claims against Tradeshift, Lanng, and others. *Id.* ¶ 18. She had been largely bedridden and unable to function since 2017 and was only just starting to emerge from the darkest period of her life. *Id.* She was in an exceedingly fragile state, far from fully recovered, and too traumatized to engage with the underlying facts and

1    circumstances of what had happened to her. *Id.* As a result, she deferred to her attorneys to

2    advocate on her behalf and reach a resolution with the responsible parties commensurate with

3    the gravity of the wrongdoing and the enormous harm inflicted on her. *Id.* ¶ 19. What Plaintiff

4    did not realize is that Lanng, Tradeshift, and her attorneys would collude to let Tradeshift off

5    the hook and leave her silenced and without recourse. *Id.* ¶ 20. In or around May 2022, her

6    attorneys advised her they had reached a settlement with Lanng. *Id.* ¶ 21. She signed the

7    agreement based on their advice. *Id.*

8         After the settlement payments never materialized, Plaintiff began to question her

9    attorneys' competence and intentions. *Id.* ¶ 22. She eventually retained new counsel, and only

10    then did she learn about the startling professional and ethical lapses of her prior counsel. *Id.*

11    What she uncovered was disturbing. Among other things: (i) the Settlement Agreement was

12    with Lanng in his individual capacity, not Tradeshift; (ii) her claims were mischaracterized as

13    personal in nature; (iii) Tradeshift was absolved of all liability to her despite not being a party to

14    the settlement and not having paid any amount to settle the claims; (iv) Plaintiff was barred

15    from speaking out about her mistreatment due to draconian confidentiality restrictions and

16    ruinous liquidated damages provisions; (v) despite not being party to it, Tradeshift could

17    purportedly enforce the Settlement Agreement against Plaintiff and force her into secret

18    arbitration where she would never be able to attain justice; (vi) in arbitration, the arbitrator

19    would be divested of the authority to invalidate the agreement or any of its provisions, even if

20    illegal; (viii) Plaintiff could not sue or initiate arbitration against Lanng even if he failed to pay.

21    *See* Doe Decl. ¶¶ 23(a)-(f); O'Byrne Decl. ¶ 5, Ex. B.

22         Plaintiff never agreed to these terms and could imagine how they could be legal. Doe

23    Decl. ¶ 24. She also could not fathom why her prior counsel would encourage her to sign such

24    an agreement in clear violation of California law and public policy or participate in a scheme to

25    help Tradeshift cover up what happened and absolve itself of legal risk without paying her

26    anything in consideration. *Id.* She never would have agreed to such an arrangement had she

27    known the truth and was tricked into forfeiting her legal rights. *Id.* ¶¶ 25-25. She has not

28    received any settlement payments from Lanng or anyone else, and Tradeshift is now trying to

5

force her into arbitration based on a settlement agreement it is not party to and for which it incurred no detriment. *Id.* ¶ 25. This is yet another attempt by Tradeshift to bury the truth and silence her. *Id.*

When Tradeshift fired Lanng on September 1, 2023, it issued a press release stating that its management team had not learned about his behavior until late August 2023. *Id.* ¶ 26. That is demonstrably false. Tradeshift's senior leadership and board of directors had *full* knowledge of what had happened to her no later than December 2019. *Id.* They have been engaged in a cover-up ever since. *Id.*

### C.   The Instant Action

On December 7, 2023, Plaintiff filed her lawsuit in the San Francisco County Superior Court (Case No. CGC-23-610929) against Tradeshift, Inc.; Tradeshift Holdings Inc.; Christian Lanng; Mikkel Hippe Brun; Gert Sylvest; Morten Sondergaard; Jeff Ransdell; King & Spalding International; Littler Mendelson, P.C.; HSBC Holdings Plc; and Koch Industries, Inc. In it, she asserted five causes of action: (1) sexual assault and battery; (2) sex trafficking under the Trafficking Victims Protection Act (18 U.S.C. § 1595) and the California Trafficking Victims Protection Act (Cal. Civ. Code § 52.5); (3) participating in/aiding and abetting a sex trafficking operation; (4) intentional infliction of emotional distress; and (5) negligence.

On January 9, 2024, Tradeshift filed a notice of removal transferring the case to the U.S. District Court for the Northern District of California (Case No. 3:24-cv-00166).

## III.   ARGUMENT

### A.   The Employment Agreement Is Not a Valid Agreement to Arbitrate Plaintiff's Claims

#### 1.   The Slave Contract, Not the Employment Agreement, Governed the Terms of Plaintiff's Employment

As Tradeshift well knows, the operative document governing Plaintiff's employment was the Slave Contract, not the Employment Agreement. The Slave Contract was signed by Tradeshift's CEO and Plaintiff's supervisor, Lanng, and was expressly intended to supersede the original on-boarding documents in connection with Plaintiff's employment. Doe Decl. ¶¶ 4,

PLAINTIFF JANE DOE'S OPPOSITION TO DEFENDANTS TRADESHIFT, INC. AND TRADESHIFT HOLDINGS INC.'S MOTION TO COMPEL ARBITRATION

Case No.: 4:24-cv-00166-JST

7; Doe Decl. ¶4, Ex. A. In practice, it did just that. Plaintiff was neither treated like, nor seen as, a normal employee due to the depraved arrangement with Lanng, who had professional expectations altogether different than, and inconsistent with, those contained in the Employment Agreement. Doe Decl. ¶¶ 5-11. There is no arbitration provision in the Slave Contract from which Plaintiff's claims arise. *See* Doe Decl. ¶ 4, Ex. A. Tradeshift is not in any position to claim, in retrospect, that Plaintiff is still bound by the original terms of her employment, which had long since been altered by the time of her wrongful termination.

> ## 2. Tradeshift Holdings Is Not Party to the Employment Agreement's Arbitration Provision

Tradeshift Holdings is not even a party to the Employment Agreement it is trying to enforce. "In general, an arbitration clause 'may not be invoked by one who is not a party to the agreement.'" *Meeks v. Experian Info. Sols., Inc.*, No. 21-cv-03266-VC, 2021 WL 5149066, at *2 (N.D. Cal. Nov. 5, 2021) (quoting *Britton v. Co-op Banking Grp.*, 4 F.3d 742, 744 (9th Cir. 1993)). Whether an arbitration clause is enforceable involves a two-step inquiry: (i) "whether the movant is a party to the contract in which the arbitration clause is contained[;]" and if not, (ii) "whether the movant can nonetheless enforce the arbitration clause as a non-party." *Id.* at *2 (citing *Revitch v. DirecTV*, 977 F.3d 713, 716, n.2 (9th Cir. 2020)).

There are two parties to the Employment Agreement: Plaintiff and Tradeshift, Inc. O'Byrne Decl. ¶ 4, Ex. A. Tradeshift Holdings is not listed as either a party or an intended beneficiary, and it has no authority to enforce the arbitration provision because Plaintiff never expressly agreed to arbitrate with it. In their Motion, Defendants sidestep this problem by lumping together Tradeshift, Inc. and Tradeshift Holdings Inc. in a single bucket. But arbitration requires a valid agreement to arbitrate, and such an agreement is lacking between Tradeshift Holdings and Plaintiff. *See Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014) (the party seeking to compel arbitration has the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence). If Tradeshift Holdings is entitled to enforce the arbitration provision, it must do so as a nonparty. However, the Motion is silent on the legal basis, if any, enabling it to do so.

### 3.     The Settlement Agreement Superseded the Earlier Agreements

The Settlement Agreement purports to encompass Plaintiff's claims against Tradeshift and thereby supplants the previous agreement to arbitrate contained in the Employment Agreement. O'Byrne Decl. ¶ 5, Ex. B. Thus, even if the Employment Agreement's arbitration provision was, at one time, valid and enforceable as to Plaintiff's claims against Tradeshift and/or Tradeshift Holdings (it was not), it was superseded by the Settlement Agreement. In an attempt to cover-up Tradeshift's involvement in Plaintiff's mistreatment and abuse, Tradeshift and Lanng attempted to settle Plaintiff's claims as a personal, rather than employment-related matter. *See id.*; Doe Decl. ¶¶ 22-25. But her claims clearly arise from her employment.

Although Tradeshift is not a named party to the Settlement Agreement, it is an express third-party beneficiary covered by its release, confidentiality, and dispute resolution provisions. *See* O'Byrne Decl. ¶ 5, Ex. B. The Settlement Agreement purports to resolve all of Plaintiff's claims against Tradeshift arising from her employment. *Id.* at p. 3. By including Tradeshift as a releasee and affording it all of the benefits of a bona fide settlement and release without any of the detriments, including payment of consideration, the Settlement Agreement is a transparent attempt by Tradeshift to circumvent California employment laws and evade responsibility for Plaintiff's depraved mistreatment during her employment. Unseemly as it is, Tradeshift cannot now attempt to resurrect the original Employment Agreement. The employment nexus is underscored by the Settlement Agreement's inclusion of an Age Discrimination in Employment Act of 1967 ("ADEA") waiver. O'Byrne Decl. ¶ 5, Ex. B at pp. 10-11. Personal disputes clearly do not give rise to ADEA claims, and the waiver of such claims belies Lanng's and Tradeshift's position that the Settlement Agreement is personal in nature.

The Settlement Agreement contains its own putative an arbitration provision covering "[a]ny controversy, dispute, or claim arising out of, in connection with, or related to the interpretation, performance or breach of this Agreement[.]" *Id.* at p. 4. Since the Settlement Agreement purports to encompass claims arising from Plaintiff's employment, its arbitration therefore supersedes that of the Employment Agreement.

///

**B.** **The Settlement Agreement Is Not a Valid Agreement to Arbitrate**

**1.** **The Settlement Agreement Is Tainted by An Illegal Purpose and Violative of Public Policy**

It is clear that the Settlement Agreement purports to cover Plaintiff's employment claims against Tradeshift despite Tradeshift not being a named party. It mischaracterizes the nature of Plaintiff's claims and the context in which they arose in an attempt by Lanng and Tradeshift attempt to sidestep the rights and protections of employees conferred by California law on Plaintiff and the legal framework governing the employer/employee relationships and the termination thereof. Tradeshift and Lanng have attempted to avoid implicating Tradeshift in Lanng's conduct and the employment laws applicable to Tradeshift in light of such conduct. This attempt to insulate Tradeshift from liability and deprive Plaintiff of her statutory rights violates California law and public policy.

The California Supreme Court's decision in *Armendariz v. Foundation Health Psychcare Services, Inc.*, 24 Cal.4th 83, 124 (2000) is instructive: "Courts are to look to the various purposes of the contract. If the central purpose of the contract is tainted with illegality, then the contract as a whole cannot be enforced. If the illegality is collateral to the main purpose of the contract, and the illegal provision can be extirpated from the contract by means of severance or restriction, then such severance and restriction are appropriate." *See also Marathon Entertainment, Inc. v. Blasi*, 42 Cal.4th 974, 996 (2008) (same); *Poublon v. C.H. Robinson Company*, 846 F.3d 1251, 1272 (9th Cir. 2008) (a contract is permeated with unlawfulness (and severance in inappropriate) where "[t]he good cannot be separated from the bad, or rather the bad enter into and permeates the whole contract, so that none of it can be said to be good.")

In determining whether to sever unconscionable terms, the overarching inquiry is "whether the interest of justice . . . would be furthered by severance." *Armendariz*, 24 Cal.4th at 124-25. Courts have identified three reasons for denying severance of unconscionable terms. First, "[i]f the central purpose of the contract is tainted with illegality, then the contract as a whole cannot be enforced." *Id.* at 124. Second, the fact that an "arbitration agreement contains more than one unlawful provision" may "indicate a systematic effort to impose arbitration . . .

an inferior forum that works to the [employer's] advantage" and may justify a conclusion "that the arbitration agreement is permeated by an unlawful purpose." *Id.* Third, if "there is no single provision a court can strike or restrict in order to remove the unconscionable taint from the agreement," the court would have to "reform the contract, not through severance or restriction, but by augmenting it with additional terms," which would exceed its power to cure a contract's illegality." *Id.*

Because the Settlement Agreement is tainted with illegality and was devised for an illegal purpose, to wit, insulating Tradeshift from liability for the conduct of Lanng and stripping Plaintiff of her legal rights under California employment laws, severance is inappropriate, and the Court should decline to enforce it in any manner.

### 2. The Settlement Agreement's Confidentiality and Non-Disparagement Provisions Are Unlawful

Beyond the manifest illegality of its purpose, the Settlement Agreement also contains a host of illegal and/or unenforceable provisions, among which are the non-disparagement, confidentiality, and arbitration provisions.

Section 12 of the Settlement Agreement (the "Non-Disparagement Clause") provides, in pertinent part: "[Jane Doe] and Lanng . . . agree not to make, publish, or disseminate any statement . . . or instigate, assist or participate in the making of any statement, written or verbal, that would defame, disparage (whether or not such disparagement legally constitutes libel or slander), suggest wrongdoing on the part of, or place in a negative light the personal or business reputation, practices, or conduct of Lanng or [Jane Doe], their businesses, or their families, irrespective of the truthfulness or falsity of such remarks." O'Byrne Decl. ¶ 5, Ex. B at p. 8.

Section 11 of the Settlement Agreement (the "Confidentiality Clause") provides, in pertinent part: "[Jane Doe] and Lanng . . . agree not to disclose to any person or entity that is not a Party to this Agreement: (a) any of the Confidential Information; (b) any information, document, material, correspondence, or communication that is in any way related to any aspect of the Parties' relationship; or (c) any other non-public information about either party that the other reasonably should know is private or confidential." *Id.* at pp. 6-7. Section 10 of the

Settlement Agreement defines "Confidential Information" to include "**any allegation by [Jane Doe] of any alleged tort, crime, misconduct, or other wrongdoing by Lanng, or conduct by [Jane Doe] while employed by Tradeshift, Inc.[.]**" *Id.* at p. 6. (emphasis added).

The Non-Disparagement and Confidentiality Clauses violate California Government Code § 12964.5, which provides, in pertinent part: "It is an unlawful employment practice for an employer or former employer to include in any agreement related to an employee's separation from employment any provision that prohibits the disclosure of information about unlawful acts in the workplace." Cal. Gov't Code § 12964.5(b)(1)(A). "A nondisparagement or other contractual provision that restricts an employee's ability to disclose information related to conditions in the workplace shall include, in substantial form, the following language: 'Nothing in this agreement prevents you from discussing or disclosing information about unlawful acts in the workplace, such as harassment or discrimination or any other conduct that you have reason to believe is unlawful.'" Cal. Gov't Code § 12964.5(b)(1)(B). "[I]information about unlawful acts in the workplace' includes, but is not limited to, information pertaining to harassment or discrimination or any other conduct that the employee has reasonable cause to believe is unlawful." Cal. Gov't Code § 12964.5(c). "**Any provision in violation of [the subsection] is against public policy and shall be unenforceable**." Cal Gov't Code § 12964.5(b)(2) (emphasis added). The Non-Disparagement and Confidentiality Clauses violate Cal. Gov't Code § 12964.5 because they purport to prohibit Plaintiff from disclosing information about unlawful acts in the workplace, including, but not limited to, the terms of the "Slave Contract" and the sex trafficking and repeated acts of sexual violence she endured during her employment, all of which is unlawful. They also do not include the required language set forth in Cal Gov't Code § 12964.5(b)(1)(B).

The Non-Disparagement and Confidentiality Clauses also violate California Civil Code § 1670.11, because they impair Plaintiff's right to testify about her experiences as a victim of sex trafficking and repeated assault. Any such testimony plainly relates to "alleged criminal conduct or alleged sexual harassment on the part of the other party to the contract[.]" Cal. Civ. Code § 1670.11. Accordingly, the Settlement Agreement is unenforceable to the extent it

11

impairs Plaintiff's rights to so testify.

### 3. The Settlement Agreement's Arbitration Provision Is Unlawful

The Settlement Agreement's arbitration provision is also unlawful to the extent it purports to waive Plaintiff's statutory and constitutional right to file a lawsuit in court to challenge its enforceability. *See* Byrne Decl. ¶ 5, Ex. B at p. 5. Indeed, if Plaintiff is found to have breached the Non-Disparagement or Confidentiality Clauses, including by testing the arbitration provision in court, the Settlement Agreement provides that she forfeits all consideration paid or payable. *Id.* at p. 9.

Even more telling under the circumstances is that the arbitration provision expressly constrains the arbitrator's ability to review the legality and/or validity of the Settlement Agreement or any of its provisions. Pursuant to Section 9.1, "[t]he Arbitrator **shall not** have the power to invalidate this Agreement or any part thereof and any Award to that effect will be outside of the powers of the Arbitrator." *Id.* at p. 5. (emphasis added). Lanng, Tradeshift, and their counsel are aware that these provisions violate California public policy, which is why Lanng and Tradeshift inserted a provision purporting to waive Plaintiff's right to assert public policy challenges to the terms.

### C. The Settlement Agreement Is Void for Fraud in the Execution

Under California law, where "the promisor is deceived as to the nature of [her] act, and actually does not know what [s]he is signing, or does not intend to enter into a contract at all, mutual assent is lacking, and [the contract] is void." *Rosenthal v. Great Western Fin. Securities Corp.*, 14 Cal.4th 394, 415 (1996); 1 Witkin, Summary 10th (2016) Contracts, § 299. This type of deception, known as "fraud in the inception or execution," undermines the very formation of a contract; it goes to "whether any contract had **ever** existed." *Saint Agnes Med. Ctr. v. PacifiCare of Cal.*, 31 Cal.4th 1187, 1200 (2003). Fraud in the execution, with respect to any contract, occurs when a party is deceived as to the nature of his action, and actually does not know what he is signing, or does not intend to enter into a specific type of agreement at all. *Rosenthal,* 14 Cal.4th at 415; *Brown v. Wells Fargo Bank, N.A.*, 168 Cal.App.4th 938, 958 (2008); *Hotels Nevada v. L.A. Pacific Center, Inc.*, 144 Cal.App.4th 754, 763 (2006). "[C]laims

12

of fraud in the execution of the entire agreement are ***not arbitrable*** under either state or federal law. If the entire contract is void *ab initio* because of fraud, the parties have not agreed to arbitrate any controversy[.]" *Rosenthal,* 14 Cal.4th at 416 (emphasis added).

Here, the Settlement Agreement and its arbitration provision are void for fraud in the execution. Plaintiff did not know what she was signing and did not assent to terms of the agreement, which released Tradeshift from liability for no consideration, falsely characterized her claims personal in nature and not employment-related, subjected her to draconian liquidated damages provisions, impaired her legal right to testify about her experiences as a victim of sex trafficking, foreclosed any recourse for nonpayment by Lanng, and forbade the arbitrator from invalidating any of the unlawful terms permeating the Settlement Agreement. Doe Decl. ¶¶ 21-25; *see generally* O'Byrne Decl. ¶ 5, Ex. B. Plaintiff did not know about any of this and would never have agreed to absolve Tradeshift from liability or silence herself. Doe Decl. ¶¶ 24-25/ Where, as here, the plaintiff is deceived as to the basic character of the document she signs, fraud in the execution has occurred and no contract had been formed. *See Rosenthal,* 14 Cal.4th at 415, 425.

### D.    The Settlement Agreement's Arbitration Provision Is Unconscionable

The Settlement's arbitration provision is unenforceable because it is unconscionable. "If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract[.]" Cal. Code Civ. Proc. § 1670.5. "The doctrine of unconscionability has a procedural and a substantive element, the former focusing on oppression or surprise due to unequal bargaining power, the latter on overly harsh or one-sided results." *Baltazar v. Forever 21, Inc.*, 62 Cal.4th 1237, 1243 (2016) (internal quotation marks omitted) (quoting *Sonic–Calabasas A, Inc. v. Moreno*, 57 Cal.4th 1109, 1133 (2013)). Although procedural and substantive unconscionability must both be present in order for a court to exercise its discretion to refuse to enforce a contract or clause under the doctrine of unconscionability, they need not be present in the same degree; the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to conclude that the term is unenforceable, and vice versa. *See Armendariz*, 24 Cal.4th

---

at 114.

### 1.    The Arbitration Provision Is Procedurally Unconscionable

In 2022, when the Settlement Agreement was signed, Plaintiff was in a dire mental state resulting from years of torture and sexual abuse as an employee of Tradeshift. Doe Decl. ¶ 18. She had been bedridden for approximately 5 years. *Id.* Because she was too traumatized to engage with the underlying facts, she deferred to her attorneys to advocate on her behalf. *Id.* ¶ 19. She later learned that her then-counsel had colluded with Tradeshift to include highly unusual, unlawful, and unfavorable provisions that she did not know about and did not bargain for. *Id.* ¶¶ 20-25. These included the obligation to arbitrate with Tradeshift, a nonparty to the agreement who paid her no consideration. *Id.* ¶ 30. This amounts to surprise and thereby renders the Settlement Agreement's arbitration provision procedurally unconscionable.

### 2.    The Arbitration Provision Is Substantively Unconscionable

As to substantive unconscionability, "[t]he substantive element of unconscionability pertains to the fairness of an agreement's actual terms and to assessments of whether they are overly harsh or one-sided. This includes consideration of the extent to which the disputed term is outside the reasonable expectation of the nondrafting party or is unduly oppressive." *Carbajal v. CWPSC, Inc.*, 245 Cal.App.4th 227, 247 (2016). Here, the arbitration provision is substantively unconscionable on its face because it, among other things: (i) divests from the arbitrator to power to review its own legality or the legality of any other part of the Settlement Agreement; and (ii) purports to waive Plaintiff's right to assert public policy challenges to it. O'Byrne Decl. ¶ 5, Ex. B at pp. 4-5.

### E.    The Court Should Refuse to Enforce the Purported Arbitration Agreement(s) Pursuant to Cal. Code Civ. Proc § 1281.2(c)

There is a compelling public policy, embodied in Cal. Code Civ. Proc. § 1281.2(c), which empowers a court to refuse enforcement of an arbitration agreement, and to allow the action as to all parties to proceed in court, when a party to the purported arbitration agreement is also a party to a pending court action with a third party arising out of the same transaction or a series of related transactions, and there is a possibility of conflicting rulings of law and fact. Cal.

14

PLAINTIFF JANE DOE'S OPPOSITION TO DEFENDANTS TRADESHIFT, INC. AND TRADESHIFT HOLDINGS INC.'S MOTION TO COMPEL ARBITRATION
Case No.: 4:24-cv-00166-JST

Code Civ Proc. § 1281.2(c); *Fitzhugh v. Granada Healthcare & Rehabilitation Center, LLC*, 150 Cal.App.4th 469, 475 (2007). Section 1281(c) is based on the legislative finding that, "[i]n actions involving multiple parties with related claims, where some claimants agree to arbitrate their differences and others remain outside the agreement, *arbitration is unworkable*.

Here, Plaintiff alleges a wide-ranging conspiracy to engage in and cover up sex trafficking on the part of a large group defendants, including multinational corporations, law firms, and private individuals. *See generally* FAC. The claims asserted against the other defendants overlap significantly with Plaintiff's claims against Tradeshift. Tradeshift cannot be allowed to force this case into arbitration while the other defendants remain in court litigating the same issues. Neither the Court nor the jury will be able to adequately consider the amount of each defendant's liability if this case is severed in two. There is a probability of conflicting rulings that renders arbitration unworkable.

F.   **If the Court Is Inclined to Grant the Motion, It Should Hold an Evidentiary Hearing Before Compelling Arbitration**

Plaintiff has furnished the Court with sufficient evidence to deny Defendants' Motion on the submissions alone. However, if for any reason the Court finds that there still remain material factual disputes regarding the existence or enforceability of the ostensible arbitration agreements, the law dictates that the proper procedure is to have an evidentiary hearing on the matter. *See e.g. Ashburn v. AIG Financial Advisors, Inc.*, 234 Cal.App.4th 79, 96-98 (2015); *Rosenthal*, 14 Cal.4th at 413-414; *Brown*, 168 Cal.App.4th at 959; *Hotels Nevada*, 144 Cal.App.4th at 762-763, 764-765. Indeed, in the face of a material factual dispute regarding the existence or enforceability of the agreements, it is an abuse of discretion and reversible error for a court to fail to hold an evidentiary hearing. *Ashburn,* 234 Cal.App.4th at 98.

IV.   **CONCLUSION**

For all the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' Motion.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

Dated:  March 19, 2024

FREEDMAN TAITELMAN + COOLEY, LLP

*/s/ Bryan J. Freedman*
Bryan J. Freedman
Miles M. Cooley
Jason H. Sunshine

*Attorneys for Plaintiff Jane Doe*