CHRISTOPHER FROST (SBN 200336)
chris@frostllp.com
JEFFREY BOGERT (SBN 132778)
jeff@frostllp.com
NICHOLAS LAUBER (SBN 288499)
nick@frostllp.com
FROST LLP
10960 Wilshire Boulevard, Suite 2100
Los Angeles, California 90024
Telephone: (424) 254-0441
Facsimile: (424) 600-8504

Attorneys for Defendant/Counterclaimant
Christian Lanng

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| JANE DOE,<br><br>              Plaintiff,<br><br>       vs.<br><br>TRADESHIFT, INC., et al.<br><br>              Defendant. | Case No. 4:24-cv-00166-JST<br><br>*Assigned for all purposes to :*<br>*Hon. John S. Tigar Courtroom 6*<br><br>**DEFENDANT AND COUNTERCLAIMANT CHRISTIAN LANNG'S COUNTERCLAIMS FOR:**<br><br>**1.) BREACH OF CONTRACT**<br>**2.) EXTORTION**<br>**3.) INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**<br>**2.) DEFAMATION (FALSE LIGHT)**<br><br>**[DEMAND FOR JURY TRIAL]** |
| CHRISTIAN LANNG,<br>              Counterclaimant,<br>       vs.<br>JANE DOE; BRYAN J. FREEDMAN;<br>MILES COOLEY and FREEDMAN,<br>TAITELMAN, & COOLEY, LLP; and<br>DOES 1 through 10, inclusive,<br>              Defendant. | |

Attorneys licensed in California hold an understood and important fiduciary obligations to their client. Often times, however, it is easy to use those obligations as an artifice to justify an equally sacred obligation-one owed to the Court, to clients and adversaries, and to society as a whole—not to abuse an attorney's position of authority and trust (let alone their high-profile presence) to manipulate the system in a way that is illegal and extorts adversaries into subversive settlements under threats of exposure or "throwing away your future."

The fact that attorneys as prominent as Bryan Freedman and his colleagues would engage in such misconduct by threatening to go to the media if counterclaimant Christian Lanng ("Counterclaimant" or "Lanng") did not pay $10 Million is sufficiently troubling. The fact that they did so while Lanng was temporarily unrepresented by counsel, and perpetuated that misconduct by hiring third parties to create deepfake stories about Lanng makes it even more unconscionable.

There is a very clear line between zealous advocacy and untoward and illegal conduct. These Counter-Defendants chose to cross that line, with no apology, regret, or remorse for the harm they were causing Lanng and others. For these reasons, Lanng brings the instant Counterclaim against Plaintiff Jane Doe, as well as Bryan Freedman, Miles Cooley, and Freedman, Taitelman, & Cooley LLP alleging the following on personal knowledge, or, where Counterclaimant lacks personal knowledge, upon information and belief.

## **PARTIES**

1.      At all relevant times, Counter-Defendant, Jane Doe, upon information and belief, is and has been a resident of Santa Clara County, State of California.

2.      At all relevant times, Counter-Defendant, Bryan J. Freedman ("Freedman"), upon information and belief, is and has been a resident of Los Angeles County, State of California.

3.      At all relevant times, Counter-Defendant, Miles Cooley ("Cooley"), upon information and belief, is and has been a resident of Los Angeles County, State of California.

4.      At all relevant times, Counter-Defendant, Freedman, Taitelman, & Cooley LLP, upon information and belief, is and has been a California limited liability partnership, with its principal place of business in Los Angeles, California

5.      Cooley, Freedman, and Freedman & Taitelman, LLP shall be referred to herein as the "Law Firm Defendants."

6.      At all relevant times, Lanng is a resident of London, and was formerly a resident of the State of California.

7.      The true names and capacities of the Counterclaim Defendants sued herein as DOE DEFENDANTS 1 through 10, inclusive, are currently unknown to Counterclaimant, who therefore sues such Counterclaim Defendants by fictitious names.

8.      Counterclaimant is informed and believes that at all relevant times, every Counterclaim Defendant was acting as an agent and/or employee of each of the other Counterclaim Defendants and was acting within the course and scope of said agency and/or employment with the full knowledge and consent of each of the other Counterclaim Defendants, and that each of the acts and/or omissions complained of herein was ratified by each of the other Defendants.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1367 in that these Counterclaims arise out of the same transactions or occurrences that are the subject matter of Plaintiff's Complaint in this action.

10.      Venue is proper in this Court under 28 U.S.C. § 1391 in that Counter-Defendant Jane Doe has voluntarily submitted to personal jurisdiction in this district by filing the Complaint in this action, which was removed to this Court.

11.     This Court has personal jurisdiction over Counter-Defendant because the unlawful acts described herein were directed at Counterclaimant in the state of California and occurred in the state of California. In fact, many of the unlawful acts occurred in the Northern District of California and were made in furtherance of this action before this Court. Accordingly, this Court has jurisdiction over the controversy that arises out of that conduct.

## BACKGROUND FACTS COMMON TO ALL CLAIMS

12.     Plaintiff Jane Doe and Lanng began a personal, consensual, romantic relationship in early 2014. Approximately one month after they began dating, Lanng helped Jane Doe get a job at his company (Tradeshift) as his interim executive assistant.

13.     Although Lanng ended his personal relationship with Jane Doe approximately five months after she began working at Tradeshift, Jane Doe continued to work with others at Tradeshift for nearly six more years. Jane Doe was eventually let go as part of a reduction in force in 2020.

14.     After being let go, Jane Doe began to make varied, non-specific, and incoherent allegations of sexual misconduct regarding Lanng and other executives at Tradeshift, as well as claiming she was entitled to "due credit, appropriate compensation for my work, [and that her] shares are grossly incorrect [sic]." (Dkt. 1-1, ¶ 66, Page 34 of 62)

15.     After several efforts to deal with Jane Doe's post-termination emails within the context of a human resources complaint attendant to the 2020 reduction in force, Jane Doe apparently stopped her complaints and went silent.

16.     In December 2021, Tradeshift announced $200 million in additional funding from a combination of existing and new investors, valuing the company at over $2 billion. In reality, the company had largely restructured debt, alongside a relatively modest capital raise. During this time, a major bank was also considering acquiring Tradeshift.

17. Soon thereafter, Jane Doe obtained legal counsel to advance her allegations of sexual misconduct against Lanng and Tradeshift in hopes of a cash settlement.

18. At the same time, Lanng was in discussions with a major bank to sell Tradeshift, which would have greatly benefited Lanng and the Tradeshift shareholders. Lanng was privately advised to reach a confidential settlement with Jane Doe, despite his innocence, for the sake of trying to salvage the potential sale of Tradeshift.

19. In May 2022, Lanng reached a settlement agreement with Jane Doe and expressly disavowed any misconduct as part of the resolution. The May 2022 settlement agreement contained confidentiality and arbitration clauses, which altogether prevented Jane Doe from suing Lanng or Tradeshift, regardless of whether the settlement was ultimately paid in full.[1] As part of the settlement, Jane Doe and her counsel also agreed to maintain the terms, substance, and underlying allegations of the settlement agreements confidential.

20. Jane Doe was paid installments per the terms of the settlement agreement over the next year. However, after one late payment, Jane Doe demanded that she be paid more than the $10 million she **agreed** to in the settlement agreement.  Now that she had millions of dollars to hire counsel of her choosing to push for even more money than bargained for, she chose to engage Law Firm Defendants, a Hollywood law firm with media connections to advance her scheme.

### The Scheme to Defraud and Extort

21. Law Firm Defendants, in an attempt to leverage a higher settlement, hired third parties to develop fake websites and Twitter accounts to fabricate accounts of misconduct by Lanng in early 2023.

---

[1] In anticipation of liquidity from the would-be acquisition of Tradeshift, the settlement agreement required Lanng to pay Jane Doe $10 million, to be paid with proceeds of a sale of the company to the bank.  The parties entered into a second settlement months thereafter when the liquidity event failed to materialize  , renegotiating    the timeline of the payments and providing Jane Doe with additional compensation.

22.     The express purpose of the fraudulent websites and Twitter accounts was to share fabricated stories of misconduct to all of Lanng's professional network, including his business partners and employees, all with a view towards embarrassing and intimidating Lanng so that he would agree to pay even more money than the sum already paid in violation of the settlement agreements, and all premised on fraud.

23.     Thus, claims in the complaint that individuals associated with Tradeshift "knew" about Lanng's alleged misbehavior stem solely from Plaintiff's counsel's own contact with these individuals through a social media smear campaign.

24.     Jane Doe's efforts motivated Tradeshift to terminate Lanng as CEO of Tradeshift on September 1, 2023. As a consequence of his termination, and a public statement from Tradeshift about alleged sexual misconduct, material business opportunities previously available to Lanng, including another funding round, were retracted.  (Dkt. 1-1, ¶ 15, Page 14 of 62)  As such, Lanng was unrepresented by counsel for a short time in September of 2023.

25.     Once Law Firm Defendants learned that Lanng was unrepresented, they pounced. They informed Lanng that they were in contact with the media and threatening Lanng that media coverage, including the coverage resulting from the public filing of a complaint, would have a "lasting effect on [Lanng's] ability to do business" and threatening that he would be "throwing away [his] future."

26.     Law Firm Defendants advised that these consequences could be avoided if Lanng paid an additional $10 million, on top of what Jane Doe had already obtained. In this regard, Defendant Freedman texted Lanng on September 5, 2023 stating explicitly that the deal was to have "10m paid by 8/15 [sic]", and that, "if that happened there would be no reason to file." Below is a screenshot of the text exchange:

To: Bryan Freedman

iMessage
Mon, Sep 4 at 5:57 PM

Christian, I understand you're no longer represented by counsel. This is Bryan Freedman counsel for two of the women filing claims against you. I have been asked by a major media outlet if you would appear to explain your side of the story this week in conjunction with the claims being filed. They can have you appear by zoom. It is unfortunate that your former lawyers allowed it to get to this point but your failure to resolve this has led to permanent and irreparable harm to all that have been harmed. Throwing away your future and the mental well being of these victims never needed to happen.

Mon, Sep 4 at 11:10 PM

Bryan, I will get back ASAP with new counsel, any kind of media will not help achieve any outcome I'm afraid.

Tue, Sep 5 at 1:46 PM

Christian, I don't control media as you know but once filed cases take on lives of their own. Obviously making payment avoids the filing. Is that happening today? Bruce offered 10m paid by 8/15. If that happened there would be no reason to file. Let me know if you want to avoid this being much more difficult as our papers are ready to go.

Payments can only happen if I close my secondary deal, that's the reality, I have no other assets and any media will tank it, happy to explain in detail

There is a different story all the time. I would rather not see your future compromised but how many promises can be broken without action being taken. I imagine you understand the mental state I am dealing with. Obviously better for lawyers to get clients money but ethically I have no choice but to follow my clients decisions. I was brought in for a conclusion. The unfortunate part is the lasting effect on your ability to do business and it's a shame that you could make this go away instead of permanent destruction.

27.    Law Firm Defendants went so far as to threaten to leak the story to TMZ, a Hollywood tabloid, if the $10 million was not paid.

28.    Defendant Freedman did a video interview with TMZ on August 4, 2023, ostensibly regarding a separate case in which he waved an enlarged version of the "Slave Contract" on camera, and approached the camera to clearly exhibit its content with only the names redacted as a clear threat to Counterclaimant. Defendant Freedman attached this "Slave Contract" to the complaint in this matter as an exhibit.



29.     Faced with outright extortion, and without legal counsel himself, Lanng was then subjected to a merciless fraudulent social media campaign orchestrated by Law Firm Defendants and directed at Lanng's professional contacts in an attempt to further ostracize him and make good on their promise to have a "lasting effect on his ability to do business."  In doing so, Jane Doe and Law Firm Defendants crossed the line of advocacy, into conduct unbecoming of a member of the state bar and into criminality.

30.     Again, all of the above was to extort money from Lanng in excess of, and in violation of, the terms of the May 2022 Settlement Agreement. When no additional money was paid to them, Jane Doe and Law Firm Defendants made good on their threat and further leveraged their contacts in the media, filed the complaint,

and smeared Lanng with a fabricated and intentionally salacious story untethered to reality and in contravention of the May 2022 Settlement Agreement.

**Jane Doe**

31.    Jane Doe began a romantic relationship with Lanng in January 2014. The relationship eventually incorporated, by mutual agreement, elements of BDSM, a sexual practice used on a regular basis by over one-third of all Americans, according to some studies.[2]

32.    As part of BDSM, some couples enter into a "slave contract," which is used to set ground rules, to establish the slave is a willing participant in a relationship incorporating elements of BDSM, and to memorialize the participants' consent in writing.

33.    A "slave contract" in the BDSM context documents things like rules, hard limits, safe words, and how the contract can be terminated. Despite using the word 'contract,' the BDSM "slave contract" between Jane Doe and Lanng was merely a sexual prop downloaded from the Internet and drafted mostly by Jane Doe and never used in reality. A BDSM "slave contract" is by no means intended to be enforceable, let alone part of an employer/employee relationship as Plaintiff alleges here.

34.    After working for Lanng as an executive assistant, in 2014 Jane Doe moved on to other roles at Tradeshift that did not involve regular, direct contact with Lanng, where she remained for over five years.

35.    In January 2020, Tradeshift conducted a round of layoffs.  Jane Doe was let go from Tradeshift during this round of layoffs in May 2020.  Jane Doe first raised her concerns after this time, as detailed herein.

36.    In response, the HR department conducted an independent investigation of Jane Doe's allegations in the summer of 2022. Lanng disclosed to HR that he had, at one point, had a romantic relationship with Jane Doe. The investigation included

---

[2] https://www.psychologytoday.com/us/blog/all-about-sex/202301/bdsm-is-increasingly-mainstream-and-it-boosts-intimacy

DEFENDANT AND COUNTERCLAIMANT CHRISTIAN LAANG'S COUNTERCLAIMS-
Case No. 4:24-cv-00166-JST

testimony from a broad range of Tradeshift employees, from C-suite leaders to rank and file, as well as other employees previously dismissed by the company, which was presented to the Board of Directors. The investigation concluded that there was no evidence that any HR policy was violated by the private romance.

**The Complaint**

37.     The complaint in this action itself illustrates that Jane Doe's allegations are inconsistent with common sense, unsupported by real evidence, and are completely divorced from reality.

38.     The complaint places great emphasis on the "Slave Contract," as a means to imply that sexual slavery, including means of BDSM torture was *quid pro quo* for employment as an assistant. It is inconceivable that an employee would ever be presented with a sexual "slave contract" allowing their boss to spank them at any time as part of their employment.  It is even more incredulous to assert in a legal pleading that the employee signed the "slave contract" because they "did not want to lose the opportunity to work a Tradeshift," as alleged.  (Dkt. 1-1, ¶ 5 Page 9 of 62)

39.     Any person presented with such a contract in the workplace would have sought legal recourse when presented with these terms, in this case over ten years ago, and not become a sexual slave because her job was a great "opportunity" to be an assistant, as the complaint alleges.

40.     Other portions of the complaint also mischaracterize the facts.   For example, the complaint's allegation that Jane Doe's email to HR in June 2020 that she was "bedridden" as a result of losing her job is the result of being the victim of "sex trafficking" is false.  (Dkt. 1-1, ¶ 66, Page 34 of 62)  No mention is made of any sex trafficking in the June 2020 email. Rather, the email rambles incoherently that first, she "is owed medical treatment because I cannot afford the frequency of need" and second, that "for over a year now who has worked on deeper levels of trauma handles medicine and documents trauma for legal system [sic]."  *Id.*

41.     In a second email to HR dated July 19, 2020, Jane Doe is apparently suicidal, stating that she "cannot die like this" and that Tradeshift "ruined me life [sic]" due in part to her not receiving "due credit, appropriate compensation for my work, shares are grossly incorrect [sic]." (Dkt. 1-1, ¶ 66, Page 35 of 62) Jane Doe also claimed that she was owed back pay because she was an "executive." *Id.*  No mention was made at this time about any "slave contract" with Lanng, or any "sex trafficking." *Id.* Other emails included in the complaint similarly make no mention at all about the allegations in the complaint.

42.     Anyone of sound mind reviewing this "evidence" would at the very least develop a suspicion that these communications were generated from an individual that is mentally unstable. Jane Doe's counsel had the duty to look into the facts before moving forward but chose not to.

43.     Even a cursory examination of Jane Doe's past would lead a reasonable and competent attorney to consider carefully the source of the allegations.  First, it is a matter of public record that Jane Doe has been convicted of a crime of moral turpitude. Second, a basic pre-litigation investigation would reveal that Jane Doe has never had any real employment of mention other than her years at Tradeshift as an assistant. Third, while investigating Jane Doe's treatment by a psychologist, detailed in the complaint, Defendants would have learned that Jane Doe has been seeking psychological treatment for most of her adult life, and not as the result of any interaction with Lanng.

44.     Individuals suffering from mental health problems should be treated with sympathy, and should not be discouraged from seeking help.  However, it remains the duty of counsel to thoroughly investigate allegations before presenting them to the Court.

45.     However, instead of investigating the allegations properly, Jane Doe's lawyers took advantage of what they viewed as a quick payday and decided to develop a story to present to the media that is implausible on its face.  First, Jane Doe's counsel

has completely misrepresented Jane Doe's contributions while working as an employee at Tradeshift, inflating her role as an assistant to someone who was integral to Tradeshift's success raising hundreds of millions of dollars in investment. In this regard, Jane Doe did not "contribute mightily" to Tradeshift's success and did not lead any "important initiatives." (Dkt. 1-1, ¶ 63).

46.     Second, at no point during her employment did Jane Doe ever complain to HR about sexual misconduct, let alone "sex trafficking" or a "slave contract." This is because her relationship with Lanng was consensual. The very same diary entries referenced in the complaint as "shared with Lanng" before any slave contract was ever alleged to have been entered into further demonstrate that Jane Doe was writing an electronic "diary" of her own volition, containing various musings and imagery about high fashion and travel, as seen from the samples excerpted below:





DEFENDANT AND COUNTERCLAIMANT CHRISTIAN LAANG'S COUNTERCLAIMS-
Case No. 4:24-cv-00166-JST

47.     The very same diary entries, presumably also read by Law Firm Defendants before filing suit, express her willingness to engage in BDSM (typos in original):

> **I am so obsessed and IN LOVE and in AWE and so bubbling wanting desiring aching for CHRISTIAN! my handsome man I am such a lucky girl - he makes me a woman! I am so much more confident I'm also very much his sex slave lol I'm aching to give myself to him all morning wet and waiting and when he texted i jump and screamed in joy heheehe I really like him a lot.**

48.     It is unreasonable to draw the conclusion that, "I'm very much his sex slave lol" was written at the behest of her "master." In fact, it is impossible to conclude after conducting any sort of competent investigation that Jane Doe's allegations have any merit at all.

49.     Thus, while Jane Doe's lawyers position themselves in the media as advocates against "sex trafficking," they only care about promoting their image and making money. They care so little about Jane Doe that they failed to redact her real name from the complaint, making her identity public.

50.     The complaint is a complete sham, and Law Firm Defendants should be punished for their conduct.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**BREACH OF CONTRACT**

**(Against Counter-Defendant Jane Doe)**

51.     Counterclaimant incorporates by reference and re-alleges each of the preceding paragraphs as if fully set forth fully herein.

52.     On May 14, 2022 ("Effective Date"), Lanng and Counter-Defendant Jane Doe entered a valid "Confidential Settlement Agreement and Mutual Release Agreement" attached as **Exhibit "A"** to this Counterclaim.

53.     Pursuant to this Agreement, Lanng was to make settlement payments to Counter-Defendant Jane Doe totaling $10 million ("Settlement Payment") in exchange for a full and unconditional release of all claims Jane Doe may have ever had against Lanng.

54.     The release by Counter-Defendant Jane Doe in the Agreement states in pertinent part as follows:

> 5. Release by [Jane Doe]. Except as to the obligations created by this Agreement, upon the Effective Date, [Jane Doe] on her own behalf and on behalf of each of her past and present agents, attorneys, employees, contractors, officers, directors, representatives, partners, spouses, joint venturers, partnerships, corporations, companies, predecessors-in-interest, administrators, executors, heirs, successors, assigns, and all others claiming by or through any of the foregoing (collectively, the "[Jane Doe] Releasors"), **hereby releases unconditionally, and is hereby deemed to release unconditionally, Lanng** and each of his past and present agents, attorneys, employees, contractors, officers, directors, representatives, investors, partners, spouses, partnerships, companies, predecessors-in-interest, administrators, executors, heirs, successors, assigns, and Tradeshift, Inc., and its current and former affiliates, successors, assigns, agents, representatives, creditors, shareholders, investors, attorneys, directors, officers, and employees, all of which are third-party beneficiaries to this Agreement entitled to enforce its terms, and

13

all others against whom the [Jane Doe] Releasors, or any of them, could make a claim (collectively the "Lanng Releasees"), **from any and all [Jane Doe] Claims** (as defined below). **"[Jane Doe] Claims"** for the purpose of this Section 5 **include, but are not limited to, any and all manner of action or actions, cause or causes of action, in law** or in equity or before any administrative agency, **suits,** debts, liens, contracts, agreements, promises, **liability,** claims, demands, **damages, injuries, loss, cost or** expense, **of any nature whatsoever,** known or unknown, fixed or contingent, apparent or concealed, suspected or unsuspected, **arising in tort, contract, or otherwise, which the [Jane Doe] Releasors now have or may hereafter have against the Lanng Releasees, or any of them, and whether existing in the past or the present or the future, based upon any conduct or event occurring up through and including the Effective Date.**

(¶ 5 of Confidential Settlement Agreement and Mutual Release Agreement dated May 14, 2022; bold added.)

55.    On September 12, 2022, Lanng and Jane Doe entered the "First Amendment to Confidential Settlement and Mutual Release Agreement", which extended the date for Lanng to complete the Settlement Payment, a true and correct copy of which is attached as **Exhibit "B"** to the Counterclaim. Otherwise, the Settlement Agreement was unchanged, and as so amended, the Settlement Agreement was to remain in full force. (See ¶ 5 of the First Amendment to Confidential Settlement and Mutual Release Agreement dated September 12, 2022.)

56.    Lanng has performed his obligations under the Settlement Agreement, including making the Settlement Payment.

57.     By filing the instant action against Lanng and other Defendants, Counter-Defendant has materially breached the terms of the Release contained in the Settlement Agreement. Specifically, Counter-Defendant Jane Doe agreed that she unconditionally released Lanng from all claims she could ever possibly assert against Lanng.

58.     As a direct and proximate result of Counter-Defendant Jane Does's breach of the Settlement Agreement, Lanng has suffered damages in an amount according to proof at trial, plus interest, as well as costs and attorneys' fees, all totaling no less than $40 million.

## SECOND CLAIM FOR RELIEF

### EXTORTION

**(Against Counterclaim-Defendants Jane Doe and the Law Firm Defendants)**

59.     Counterclaimant incorporates by reference and re-alleges each of the preceding paragraphs as if fully set forth fully herein.

60.     An attorney's prelitigation communication is extortion as a matter of law where the attorney's conduct falls entirely outside the bounds of ordinary professional conduct. *Flatley v. Mauro (2006) 39 Cal. 4th 299, 320.*

61.     On September 4, 2023, Defendant Freedman contacted Counterclaimant via text message aware that Counterclaimant was not represented by counsel at the time. Freedman indicated that he was in communication with a major media outlet regarding the false allegations. Freedman further stated that Counterclaimant was "throwing away [his] future."

62.     Defendant Freedman had it made clear that he was willing to make due on his threats as he appeared on TMZ in a video interview, exhibiting the "Slave Contract" on camera when discussing an unrelated case.

63.     Counterclaimant responded that he would respond with new counsel as soon as possible.

64.    Undeterred by the ethical obligations of an attorney when engaging with an unrepresented party, Freedman continued to communicate with Counterclaimant on September 5, 2024 leveling threats to make the situation "much more difficult," having a "lasting effect on your ability to do business," and "permanent destruction." Freedman threatened to cause such damage absent payment of $10,000,000 on that day.

65.    Defendant Freedman's conduct was entirely outside the bounds of professional conduct as he attempted to take advantage of an unrepresented adverse party, interfered with Counterclaimant's ability to obtain competent counsel by placing an arbitrary deadline on the extortionate demand, and provided legal advice to an unrepresented adverse party in violation of California Rules of Professional Conduct 4.3.

66.    Defendant Freedman's communication was unambiguously meant as more than a mere prelitigation demand as he had indicated he was in communication with a major media outlet prior to any public filing regarding the substance of the false allegations and that "cases take on a lives of their own."

67.    As a direct and proximate result of Defendant Freedman's extortionate demands, Lanng has suffered damages in an amount according to proof at trial.

**THIRD CLAIM FOR RELIEF**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

**(Against Counterclaim-Defendants Jane Doe and the Law Firm Defendants)**

68.    Counterclaimant incorporates by reference and re-alleges each of the preceding paragraphs as if fully set forth fully herein.

69.    Counterclaim-Defendant Freedman contacted Counterclaimant informing Counterclaimant that a major media outlet wanted to speak to Counterclaimant regarding the false allegations of Cross-Defendant Jane Doe.

70.    Counterclaim-Defendant Freedman appeared on a TMZ video interview, waiving an enlarged copy "Slave Contract" on screen and holding it up to the camera

with Counterclaimant's name redacted. Law Firm Defendants would subsequently attach the "Slave Contract" to the complaint in this matter.

71.     Counterclaim Defendants Jane Doe and Law Firm Defendants were aware of the confidentiality clause of the May 2022 settlement agreement.

72.     No public filing had been made regarding the false allegations of Counterclaim-Defendant Jane Doe.

73.     In violation of the May 2022 settlement agreement Jane Doe, through Law Firm Defendants, contacted a major media outlet to inform them of the false salacious details of Jane Doe's allegations.

74.     Jane Doe and Law Firm Defendant's conduct was outrageous in light of the nature of the allegations, the false character of the allegations, the prohibition on the disclosure of the details in light of the May 2022 settlement agreement's confidentiality clause, and the obvious and apparent damage such allegations would have upon Counterclaimant.

75.     Jane Doe and Law Firm Defendants were aware of and intended to cause damage to the reputation and livelihood of Counterclaimant through the contact with national media outlet as demonstrated by Defendant Freedman's statements that Counterclaimant would suffer permanent damage as a result in his text messages to Counterclaimant.

76.     As a result, Counterclaimant has suffered severe emotional distress and has been damaged in an amount to be determined at trial.


### FOURTH CLAIM FOR RELIEF
### FALSE LIGHT
### (Against Counterclaim-Defendants Jane Doe and the Law Firm Defendants)

77.     Counterclaimant incorporates by reference and re-alleges each of the preceding paragraphs as if fully set forth fully herein.

78.   By orchestrating a scheme to set up fraudulent social media accounts about Counterclaimant, Counterclaim-Defendants publicly disclosed information or material to knowingly portray Counterclaimant in a false light.

79.   In particular, Counterclaim-Defendant Miles Cooley coordinated on behalf of Freedman Taitelman, & Cooley, LLP and Counter-Defendant Jane Doe to hire third parties to establish fraudulent social media accounts with false allegations to obtain additional money for Jane Doe she is not entitled to. Defendant Freedman was aware of the scheme and is named herein as a co-conspirator. The use of social media accounts to spread false allegations was not legitimately related to Jane Doe's claim and is not protected by the litigation privilege.

80.   The Law Firm Defendants acted outside of the course of legal representation and in violation of the California Rules of Professional Responsibility and did not conduct the above scheme as part of any legitimate litigation.

81.   The false light created by the disclosure would be highly offensive to a reasonable person in Counterclaimant's position.

82.   Jane Doe and Law Firm Defendants knew the disclosure would create a false impression about Lanng, and did it to have a "lasting effect on [Lanng's] ability to do business" or, alternatively, acted with reckless disregard of the truth.

83.   Counterclaim-Defendants were negligent in determining the truth of the information published on social media accounts they ordered published or whether a false impression would be created by its disclosure and publication.

84.   Counterclaimant was harmed and sustained harm to his "ability to do business" and reputation as a result of Counterclaim-Defendants' conduct. Counterclaim-Defendants' conduct was a substantial factor in causing Counterclaimant's harm.

85.   Lanng has suffered damages in an amount according to proof at trial, plus interest, as well as costs and attorneys' fees, all totaling no less than $40 million.

## **PRAYER FOR RELIEF**

WHEREFORE, Counterclaimant prays for judgment against Counterclaim-Defendants as follows:

1.     For an order of compensatory, special, consequential and incidental damages caused by the conduct of Counterclaim-Defendants in an amount to be proved at trial;

2.     For an order of exemplary and punitive damages according to proof at trial;

3.     For the full amount of Counterclaimant's attorney's fees and costs incurred;

4.     For punitive damages; and

5.     Any other relief the Court may deem appropriate.


DATED: April 9, 2024                              **FROST LLP**

                                                                    By: _____

                                                                    CHRISTOPHER FROST
                                                                    JEFFERY BOGERT
                                                                    NICHOLAS LAUBER
                                                                    Attorneys for
                                                                    Defendant/Counterclaimant
                                                                    Christian Lanng

# DEMAND FOR JURY TRIAL

Defendant and Counterclaimant Christian Lanng demands a jury trial on issues triable to a jury.

DATED:  April 9, 2024            FROST LLP


By: _____
      CHRISTOPHER FROST
      JEFFERY BOGERT
      NICHOLAS LAUBER
      Attorneys for Defendant/Counterclaimant
      Christian Lanng