1  CHRISTOPHER FROST (SBN 200336)
   chris@frostllp.com
2  JEFFREY BOGERT (SBN 132778)
   jeff@frostllp.com
3  NICHOLAS LAUBER (SBN 288499)
   nick@frostllp.com
4  FROST LLP
   10960 Wilshire Boulevard, Suite 2100
5  Los Angeles, California 90024
   Telephone: (424) 254-0441
6  Facsimile: (424) 600-8504

7  Attorneys for Defendant/Counterclaimant
   Christian Lanng
8

9                 UNITED STATES DISTRICT COURT

10        NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

11

12  JANE DOE,                          Case No. 4:24-cv-00166-JST

13          Plaintiff,                 **DEFENDANT AND
                                        COUNTERCLAIMANT CHRISTIAN
14      vs.                            LANNG'S FIRST AMENDED
                                        COUNTERCOMPLAINT FOR:**
15  TRADESHIFT, INC., et al.
                                        **1.) BREACH OF CONTRACT
16          Defendant.                  2.) EXTORTION
                                        3.) INTENTIONAL INFLICTION OF
17                                      EMOTIONAL DISTRESS
                                        4.) DEFAMATION (FALSE LIGHT)
18                                      5. DEFAMATION**

19                                      **[DEMAND FOR JURY TRIAL]**

20  CHRISTIAN LANNG,

21          Counterclaimant,

22      vs.

23  JANE DOE; BRYAN J. FREEDMAN;
    MILES COOLEY and FREEDMAN,
24  TAITELMAN, & COOLEY, LLP; and DOES
    1 through 10, inclusive,
25
            Defendant.
26

27

28

Attorneys licensed in California hold an understood and important fiduciary obligations to their client. Often times, however, it is easy to use those obligations as an artifice to justify an equally sacred obligation-one owed to the Court, to clients and adversaries, and to society as a whole—not to abuse an attorney's position of authority and trust (let alone their high-profile presence) to manipulate the system in a way that is illegal and extorts adversaries into subversive settlements under threats of exposure or "throwing away your future."

The fact that attorneys as prominent as Bryan Freedman and his colleagues would engage in such misconduct by threatening to go to the media if counterclaimant Christian Lanng ("Counterclaimant" or "Lanng") did not pay $10 Million is sufficiently troubling. The fact that they did so while Lanng was temporarily unrepresented by counsel, and perpetuated that misconduct by hiring third parties to create deepfake stories about Lanng makes it even more unconscionable.

There is a very clear line between zealous advocacy and untoward and illegal conduct. These Counter-Defendants chose to cross that line, with no apology, regret, or remorse for the harm they were causing Lanng and others. For these reasons, Lanng brings the instant Counterclaim against Plaintiff Jane Doe, as well as Bryan Freedman, Miles Cooley, and Freedman, Taitelman, & Cooley LLP alleging the following on personal knowledge, or, where Counterclaimant lacks personal knowledge, upon information and belief.

## PARTIES

1.      At all relevant times, Counter-Defendant, Jane Doe, upon information and belief, is and has been a resident of Santa Clara County, State of California.

2.      At all relevant times, Counter-Defendant, Bryan J. Freedman ("Freedman"), upon information and belief, is and has been a resident of Los Angeles County, State of California.

/ / /

/ / /

3.      At all relevant times, Counter-Defendant, Miles Cooley ("Cooley"), upon information and belief, is and has been a resident of Los Angeles County, State of California.

4.      At all relevant times, Counter-Defendant, Freedman, Taitelman, & Cooley LLP, upon information and belief, is and has been a California limited liability partnership, with its principal place of business in Los Angeles, California.

5.      Cooley, Freedman, and Freedman & Taitelman, LLP shall be referred to herein as the "Law Firm Defendants."

6.      At all relevant times, Lanng is a resident of London,  and was formerly a resident of the State of California.

7.      The true names and capacities of the Counterclaim Defendants sued herein as DOE DEFENDANTS 1 through 10, inclusive, are currently unknown to Counterclaimant, who therefore sues such Counterclaim Defendants by fictitious names.

8.      Counterclaimant is informed and believes that at all relevant times, every Counterclaim Defendant was acting as an agent and/or employee of each of the other Counterclaim Defendants and was acting within the course and scope of said agency and/or employment with the full knowledge and consent of each of the other Counterclaim Defendants, and that each of the acts and/or omissions complained of herein was ratified by each of the other Defendants.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1367 in that these Counterclaims arise out of the same transactions or occurrences that are the subject matter of Plaintiff's Complaint in this action.

10.     Venue is proper in this Court under 28 U.S.C. § 1391 in that Counter-Defendant Jane Doe has voluntarily submitted to personal jurisdiction in this district by filing the Complaint in this action, which was removed to this Court.

11.     This Court has personal jurisdiction over Counter-Defendant because the unlawful acts described herein were directed at Counterclaimant in the state of California and occurred in the state of California. In fact, many of the unlawful acts occurred in the Northern District of California and were made in furtherance of this action before this Court. Accordingly, this Court has jurisdiction over the controversy that arises out of that conduct.

## BACKGROUND FACTS COMMON TO ALL CLAIMS

12.     Plaintiff Jane Doe and Lanng began a personal, consensual, romantic relationship in early 2014. Approximately one month after they began dating, Lanng helped Jane Doe get a job at his company (Tradeshift) as his interim executive assistant.

13.     Although Lanng ended his personal relationship with Jane Doe approximately five months after she began working at Tradeshift, Jane Doe continued to work with others at Tradeshift for nearly six more years. Jane Doe was eventually let go as part of a reduction in force in 2020.

14.     After being let go, Jane Doe began to make varied, non-specific, and incoherent allegations of sexual misconduct regarding Lanng and other executives at Tradeshift, as well as claiming she was entitled to "due credit, appropriate compensation for my work, [and that her] shares are grossly incorrect [sic]." (Dkt. 1-1, ¶ 66, Page 34 of 62)

15.     After several efforts to deal with Jane Doe's post-termination emails within the context of a human resources complaint attendant to the 2020 reduction in force, Jane Doe apparently stopped her complaints and went silent.

16.     In December 2021, Tradeshift announced $200 million in additional funding from a combination of existing and new investors, valuing the company at over $2 billion. In reality, the company had largely restructured debt, alongside a relatively modest capital raise. During this time, a major bank was also considering acquiring Tradeshift.

17.     Soon thereafter, Jane Doe obtained legal counsel to advance her allegations of sexual misconduct against Lanng and Tradeshift in hopes of a cash settlement.

18.     At the same time, Lanng was in discussions with a major bank to sell Tradeshift, which would have greatly benefited Lanng and the Tradeshift shareholders. Lanng was privately advised to reach a confidential settlement with Jane Doe, despite his innocence, for the sake of trying to salvage the potential sale of Tradeshift.

19.     On May 14, 2022, Lanng reached a settlement agreement with Jane Doe and expressly disavowed any misconduct as part of the resolution. The May 2022 agreement conclusively established that the dispute between Lanng and Doe  arose from their personal relationship and not their employment with Tradeshift, Inc. The May 2022 settlement agreement contained confidentiality and arbitration clauses, which altogether prevented Jane Doe from suing Lanng or Tradeshift, regardless of whether the settlement was ultimately paid in full. The settlement agreement's payments were structured so that after the First Settlement Payment would be paid with proceeds from a large investment in Tradeshift, Inc. As part of the settlement, Jane Doe and her counsel also agreed to maintain the terms, substance, and underlying allegations of the settlement agreements confidential and to not publish disparaging comments about Lanng.

20.     Jane Doe was paid the holding payment per the terms of the settlement agreement. Due to delays in receipt of funds from the large investment in Tradeshift, the settlement agreement was amended on September 12, 2022. Lanng was to make an extension payment and in exchange the future settlement payments were delayed and the clause releasing both parties from the settlement if the "First Settlement Payment" was not made was deleted. Due to further delays in receiving funds from a Tradeshift investment, payment of the First Settlement Payment was further delayed. Jane Doe demanded that she be paid more than the $10 million she **agreed** to in the

FROST

settlement agreement.  Now that she had the initial and extension payments of the settlement in her pocket, she chose to engage Law Firm Defendants, a Hollywood law firm with media connections to advance her scheme to push for even more money than previously agreed.

**The Scheme to Defraud and Extort**

21.    Law Firm Defendants, in an attempt to leverage a higher settlement, hired third parties to develop fake websites and Twitter accounts to fabricate accounts of misconduct by Lanng in early 2023.

22.    The express purpose of the fraudulent websites and Twitter accounts was to share fabricated stories of misconduct to all of Lanng's professional network, including his business partners and employees, all with a view towards embarrassing and intimidating Lanng so that he would agree to pay even more money than the sum already paid in violation of the settlement agreements, and all premised on fraud.

23.    Thus, claims in the complaint that individuals associated with Tradeshift "knew" about Lanng's alleged misbehavior stem solely from Plaintiff's counsel's own contact with these individuals through a social media smear campaign.

24.    Jane Doe's efforts motivated Tradeshift to terminate Lanng as CEO of Tradeshift on September 1, 2023. As a consequence of his termination, and a public statement from Tradeshift about alleged sexual misconduct, material business opportunities previously available to Lanng, including another funding round, were retracted.  (Dkt. 1-1, ¶ 15, Page 14 of 62)  As such, Lanng was unrepresented by counsel for a short time in September of 2023.

25.    Once Law Firm Defendants learned that Lanng was unrepresented, they pounced. They informed Lanng that they were in contact with the media and threatening Lanng that media coverage, including the coverage resulting from the public filing of a complaint, would have a "lasting effect on [Lanng's] ability to do business" and threatening that he would be "throwing away [his] future."

26.     Law Firm Defendants advised that these consequences could be avoided if Lanng paid an additional $10 million, on top of what Jane Doe had already obtained. In this regard, Defendant Freedman texted Lanng on September 5, 2023 stating explicitly that the deal was to have "10m paid by 8/15 [sic]", and that, "if that happened there would be no reason to file." Below is a screenshot of the text exchange:



27.     Law Firm Defendants went so far as to threaten to leak the story to TMZ, a Hollywood tabloid, if the $10 million was not paid.

28.     Defendant Freedman did a video interview with TMZ on August 4, 2023, ostensibly regarding a separate case in which he waved an enlarged version of the "Slave Contract" on camera, and approached the camera to clearly exhibit its content

with only the names redacted as a clear threat to Counterclaimant. Defendant Freedman attached this "Slave Contract" to the complaint in this matter as an exhibit.



29.     Faced with outright extortion, and without legal counsel himself, Lanng was then subjected to a merciless fraudulent social media campaign orchestrated by Law Firm Defendants and directed at Lanng's professional contacts in an attempt to further ostracize him and make good on their promise to have a "lasting effect on his ability to do business."  In doing so, Jane Doe and Law Firm Defendants crossed the line of advocacy, into conduct unbecoming of a member of the state bar and into criminality.

30.     Again, all of the above was to extort money from Lanng in excess of, and in violation of, the terms of the May 2022 Settlement Agreement. When no additional money was paid to them, Jane Doe and Law Firm Defendants made good

on their threat and further leveraged their contacts in the media, filed the complaint, and smeared Lanng with a fabricated and intentionally salacious story untethered to reality and in contravention of the May 2022 Settlement Agreement.

**Jane Doe**

31.     Jane Doe began a romantic relationship with Lanng in January 2014. The relationship eventually incorporated, by mutual agreement, elements of BDSM, a sexual practice used on a regular basis by over one-third of all Americans, according to some studies.[1]

32.     As part of BDSM, some couples enter into a "slave contract," which is used to set ground rules, to establish the slave is a willing participant in a relationship incorporating elements of BDSM, and to memorialize the participants' consent in writing.

33.     A "slave contract" in the BDSM context documents things like rules, hard limits, safe words, and how the contract can be terminated. Despite using the word 'contract,' the BDSM "slave contract" between Jane Doe and Lanng was merely a sexual prop downloaded from the Internet and drafted mostly by Jane Doe and never used in reality. A BDSM "slave contract" is by no means intended to be enforceable, let alone part of an employer/employee relationship as Plaintiff alleges here.

34.     After working for Lanng as an executive assistant, in 2014 Jane Doe moved on to other roles at Tradeshift that did not involve regular, direct contact with Lanng, where she remained for over five years.

35.     In January 2020, Tradeshift conducted a round of layoffs.  Jane Doe was let go from Tradeshift during this round of layoffs in May 2020.  Jane Doe first raised her concerns after this time, as detailed herein.

36.     In response, the HR department conducted an independent investigation of Jane Doe's allegations in the summer of 2022. Lanng disclosed to HR that he had,

---

[1] https://www.psychologytoday.com/us/blog/all-about-sex/202301/bdsm-is-increasingly-mainstream-and-it-boosts-intimacy

at one point, had a romantic relationship with Jane Doe. The investigation included testimony from a broad range of Tradeshift employees, from C-suite leaders to rank and file, as well as other employees previously dismissed by the company, which was presented to the Board of Directors. The investigation concluded that there was no evidence that any HR policy was violated by the private romance.

### The Complaint

37.     The complaint in this action itself illustrates that Jane Doe's allegations are inconsistent with common sense, unsupported by real evidence, and are completely divorced from reality.

38.     The complaint places great emphasis on the "Slave Contract," as a means to imply that sexual slavery, including means of BDSM torture was *quid pro quo* for employment as an assistant. It is inconceivable that an employee would ever be presented with a sexual "slave contract" allowing their boss to spank them at any time as part of their employment.  It is even more incredulous to assert in a legal pleading that the employee signed the "slave contract" because they "did not want to lose the opportunity to work a Tradeshift," as alleged.  (Dkt. 1-1, ¶ 5 Page 9 of 62)

39.     Any person presented with such a contract in the workplace would have sought legal recourse when presented with these terms, in this case over ten years ago, and not become a sexual slave because her job was a great "opportunity" to be an assistant, as the complaint alleges.

40.     Other portions of the complaint also mischaracterize the facts.   For example, the complaint's allegation that Jane Doe's email to HR in June 2020 that she was "bedridden" as a result of losing her job is the result of being the victim of "sex trafficking" is false.  (Dkt. 1-1, ¶ 66, Page 34 of 62)  No mention is made of any sex trafficking in the June 2020 email. Rather, the email rambles incoherently that first, she "is owed medical treatment because I cannot afford the frequency of need" and second, that "for over a year now who has worked on deeper levels of trauma handles medicine and documents trauma for legal system [sic]."  *Id.*

41.     In a second email to HR dated July 19, 2020, Jane Doe is apparently suicidal, stating that she "cannot die like this" and that Tradeshift "ruined me life [sic]" due in part to her not receiving "due credit, appropriate compensation for my work, shares are grossly incorrect [sic]." (Dkt. 1-1, ¶ 66, Page 35 of 62) Jane Doe also claimed that she was owed back pay because she was an "executive." *Id.*  No mention was made at this time about any "slave contract" with Lanng, or any "sex trafficking."  *Id.* Other emails included in the complaint similarly make no mention at all about the allegations in the complaint.

42.     Anyone of sound mind reviewing this "evidence" would at the very least develop a suspicion that these communications were generated from an individual that is mentally unstable. Jane Doe's counsel had the duty to look into the facts before moving forward but chose not to.

43.     Even a cursory examination of Jane Doe's past would lead a reasonable and competent attorney to consider carefully the source of the allegations.  First, it is a matter of public record that Jane Doe has been convicted of a crime of moral turpitude. Second, a basic pre-litigation investigation would reveal that Jane Doe has never had any real employment of mention other than her years at Tradeshift as an assistant. Third, while investigating Jane Doe's treatment by a psychologist, detailed in the complaint, Defendants would have learned that Jane Doe has been seeking psychological treatment for most of her adult life, and not as the result of any interaction with Lanng.

44.     Individuals suffering from mental health problems should be treated with sympathy, and should not be discouraged from seeking help.  However, it remains the duty of counsel to thoroughly investigate allegations before presenting them to the Court.

45.     However, instead of investigating the allegations properly, Jane Doe's lawyers took advantage of what they viewed as a quick payday and decided to develop a story to present to the media that is implausible on its face.  First, Jane Doe's counsel

has completely misrepresented Jane Doe's contributions while working as an employee at Tradeshift, inflating her role as an assistant to someone who was integral to Tradeshift's success raising hundreds of millions of dollars in investment. In this regard, Jane Doe did not "contribute mightily" to Tradeshift's success and did not lead any "important initiatives." (Dkt. 1-1, ¶ 63).

46.     Second, at no point during her employment did Jane Doe ever complain to HR about sexual misconduct, let alone "sex trafficking" or a "slave contract." This is because her relationship with Lanng was consensual. The very same diary entries referenced in the complaint as "shared with Lanng" before any slave contract was ever alleged to have been entered into further demonstrate that Jane Doe was writing an electronic "diary" of her own volition, containing various musings and imagery about high fashion and travel, as seen from the samples excerpted below:





47.     The very same diary entries, presumably also read by Law Firm Defendants before filing suit, express her willingness to engage in BDSM (typos in original):

> **I am so obsessed and IN LOVE and in AWE and so bubbling wanting desiring aching for CHRISTIAN! my handsome man I am such a lucky girl - he makes me a woman! I am so much more confident I'm also very much his sex slave lol I'm aching to give myself to him all morning wet and waiting and when he texted i jump and screamed in joy heheehe I really like him a lot.**

48.     It is unreasonable to draw the conclusion that, "I'm very much his sex slave lol" was written at the behest of her "master." In fact, it is impossible to conclude after conducting any sort of competent investigation that Jane Doe's allegations have any merit at all.

49.     Thus, while Jane Doe's lawyers position themselves in the media as advocates against "sex trafficking," they only care about promoting their image and making money. They care so little about Jane Doe that they failed to redact her real name from the complaint, making her identity public.

50.     The complaint is a complete sham, and Law Firm Defendants should be punished for their conduct.

51.     Subsequent to the filing of Lanng's countercomplaint, Law Firm Defendants engaged in further reprehensible conduct making untrue statements to the media, commenting on the case. Freedman, in a statement to Finans a Danish media outlet, stated that Lanng "sexually abused and victimized Jane, an employee for years" despite being aware that the romantic relationship between Lanng and Doe was consensual and only last for a few month. Freedman also stated that Lanng "did not pay a dime in settlement proceeds under the agreement that he signed" despite being

aware that Lanng paid $675,000 in holding payments. Furthermore, in that statement Freedman stated that Lanng was fired from Tradeshift in part due to his breach of the settlement agreement despite being aware that Lanng's termination notice did not reference the settlement agreement or any breach thereof. Freedman made these false statements knowing that they would further damage Lanng's reputation.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### BREACH OF CONTRACT

### (Against Counter-Defendant Jane Doe)

52.     Counterclaimant incorporates by reference and re-alleges each of the preceding paragraphs as if fully set forth fully herein.

53.      On May 14, 2022 ("Effective Date"), Lanng and Counter-Defendant Jane Doe entered a valid "Confidential Settlement Agreement and Mutual Release Agreement" attached as **Exhibit "A"** to this Counterclaim.

54.     Pursuant to this Agreement, Lanng was to make settlement payments to Counter-Defendant Jane Doe totaling $10 million ("Settlement Payment") in exchange for a full and unconditional release of all claims Jane Doe may have ever had against Lanng.

55.      The release by Counter-Defendant Jane Doe in the Agreement states in pertinent part as follows:

> 5. Release by [Jane Doe]. Except as to the obligations created by this Agreement, upon the Effective Date, [Jane Doe] on her own behalf and on behalf of each of her past and present agents, attorneys, employees, contractors, officers, directors, representatives, partners, spouses, joint venturers, partnerships, corporations, companies, predecessors-in-interest, administrators, executors, heirs, successors, assigns, and all others claiming by or through any of the foregoing

(collectively, the "[Jane Doe] Releasors"), **hereby releases unconditionally, and is hereby deemed to release unconditionally, Lanng** and each of his past and present agents, attorneys, employees, contractors, officers, directors, representatives, investors, partners, spouses, partnerships, companies, predecessors-in-interest, administrators, executors, heirs, successors, assigns, and Tradeshift, Inc., and its current and former affiliates, successors, assigns, agents, representatives, creditors, shareholders, investors, attorneys, directors, officers, and employees, all of which are third-party beneficiaries to this Agreement entitled to enforce its terms, and all others against whom the [Jane Doe] Releasors, or any of them, could make a claim (collectively the "Lanng Releasees"), **from any and all [Jane Doe] Claims** (as defined below). **"[Jane Doe] Claims"** for the purpose of this Section 5 **include, but are not limited to, any and all manner of action or actions, cause or causes of action, in law** or in equity or before any administrative agency, **suits,** debts, liens, contracts, agreements, promises, **liability,** claims, demands, **damages, injuries, loss, cost or** expense, **of any nature whatsoever,** known or unknown, fixed or contingent, apparent or concealed, suspected or unsuspected, **arising in tort, contract, or otherwise, which the [Jane Doe] Releasors now have or may hereafter have against the Lanng Releasees, or any of them, and whether existing in the past or the present or the future, based upon any conduct or event occurring up through and including the Effective Date**.

(¶ 5 of Confidential Settlement and Mutual Release Agreement dated May

14, 2022; bold added.)

56.     The Settlement Agreement further states "[Doe] and Lanng, on their own behalf and on behalf of their agents, attorneys, … agree not to make, publish, or disseminate any statement, written or verbal, through any means (including electronic, print, broadcast media, social media, the internet or otherwise), or instigate, assist or participate in the making of any statement, written or verbal, that would defame, disparage (whether or not such disparagement legally constitutes libel or slander), suggest wrongdoing on the part of, or place in a negative light the personal or business reputation, practices, or conduct of Lanng or [Doe], their businesses, or their families, irrespective of the truthfulness or falsity of such remarks." (¶ 12 of Confidential Settlement and Mutual Release Agreement.)

57.     On September 12, 2022, Lanng and Jane Doe entered the "First Amendment to Confidential Settlement and Mutual Release Agreement", which extended the date for Lanng to complete the Settlement Payment, a true and correct copy of which is attached as **Exhibit "B"** to the Counterclaim. Otherwise, the Settlement Agreement was unchanged, and as so amended, the Settlement Agreement was to remain in full force. (See ¶ 5 of the First Amendment to Confidential Settlement and Mutual Release Agreement dated September 12, 2022.)

58.     Lanng has performed his obligations under the Settlement Agreement, including making the Settlement Payment.

59.     By filing the instant action against Lanng and other Defendants, Counter-Defendant has materially breached the terms of the Release contained in the Settlement Agreement. Specifically, Counter-Defendant Jane Doe agreed that she unconditionally released Lanng from all claims she could ever possibly assert against Lanng.

60.     By making untrue statements, through her counsel Bryan Freedman, to Finans, a Danish media outlet that Lanng "sexually abused and victimized Jane, an employee, for years and then did not pay a dime in settlement proceeds under the

agreement that he signed. He was fired from Tradeshift in part for this very breach of contract …" Doe has materially breached the terms of the Non-Disparagement clause contained in the Settlement Agreement.

61.     As a direct and proximate result of Counter-Defendant Jane Does's breach of the Settlement Agreement, Lanng has suffered damages in an amount according to proof at trial, plus interest, as well as costs and attorneys' fees, all totaling no less than $40 million.

## SECOND CLAIM FOR RELIEF

### EXTORTION

**(Against Counterclaim-Defendants Jane Doe and the Law Firm Defendants)**

62.     Counterclaimant incorporates by reference and re-alleges each of the preceding paragraphs as if fully set forth fully herein.

63.     An attorney's prelitigation communication is extortion as a matter of law where the attorney's conduct falls entirely outside the bounds of ordinary professional conduct. *Flatley v. Mauro (2006) 39 Cal. 4th 299, 320.*

64.     On September 4, 2023, Defendant Freedman contacted Counterclaimant via text message aware that Counterclaimant was not represented by counsel at the time. Freedman indicated that he was in communication with a major media outlet regarding the false allegations. Freedman further stated that Counterclaimant was "throwing away [his] future."

65.     Defendant Freedman had it made clear that he was willing to make due on his threats as he appeared on TMZ in a video interview, exhibiting the "Slave Contract" on camera when discussing an unrelated case.

66.     Counterclaimant responded that he would respond with new counsel as soon as possible.

67.     Undeterred by the ethical obligations of an attorney when engaging with an unrepresented party, Freedman continued to communicate with Counterclaimant on September 5, 2024 leveling threats to make the situation "much more difficult,"

having a "lasting effect on your ability to do business," and "permanent destruction." Freedman threatened to cause such damage absent payment of $10,000,000 on that day.

68.    Defendant Freedman's conduct was entirely outside the bounds of professional conduct as he attempted to take advantage of an unrepresented adverse party, interfered with Counterclaimant's ability to obtain competent counsel by placing an arbitrary deadline on the extortionate demand, and provided legal advice to an unrepresented adverse party in violation of California Rules of Professional Conduct 4.3.

69.    Defendant Freedman's communication was unambiguously meant as more than a mere prelitigation demand as he had indicated he was in communication with a major media outlet prior to any public filing regarding the substance of the false allegations and that "cases take on a lives of their own."

70.    As a direct and proximate result of Defendant Freedman's extortionate demands, Lanng has suffered damages in an amount according to proof at trial.

## THIRD CLAIM FOR RELIEF

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

## (Against Counterclaim-Defendants Jane Doe and the Law Firm Defendants)

71.    Counterclaimant incorporates by reference and re-alleges each of the preceding paragraphs as if fully set forth fully herein.

72.    Counterclaim-Defendant Freedman contacted Counterclaimant informing Counterclaimant that a major media outlet wanted to speak to Counterclaimant regarding the false allegations of Cross-Defendant Jane Doe.

73.    Counterclaim-Defendant Freedman appeared on a TMZ video interview, waiving an enlarged copy "Slave Contract" on screen and holding it up to the camera with Counterclaimant's name redacted. Law Firm Defendants would subsequently attach the "Slave Contract" to the complaint in this matter.

74.     Counterclaim Defendants Jane Doe and Law Firm Defendants were aware of the confidentiality clause of the May 2022 settlement agreement.

75.     No public filing had been made regarding the false allegations of Counterclaim-Defendant Jane Doe.

76.     In violation of the May 2022 settlement agreement Jane Doe, through Law Firm Defendants, contacted a major media outlet to inform them of the false salacious details of Jane Doe's allegations.

77.     Jane Doe and Law Firm Defendant's conduct was outrageous in light of the nature of the allegations, the false character of the allegations, the prohibition on the disclosure of the details in light of the May 2022 settlement agreement's confidentiality clause, and the obvious and apparent damage such allegations would have upon Counterclaimant.

78.     Jane Doe and Law Firm Defendants were aware of and intended to cause damage to the reputation and livelihood of Counterclaimant through the contact with national media outlet as demonstrated by Defendant Freedman's statements that Counterclaimant would suffer permanent damage as a result in his text messages to Counterclaimant.

79.     As a result, Counterclaimant has suffered severe emotional distress and has been damaged in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF

### FALSE LIGHT

**(Against Counterclaim-Defendants Jane Doe and the Law Firm Defendants)**

80.     Counterclaimant incorporates by reference and re-alleges each of the preceding paragraphs as if fully set forth fully herein.

81.     By orchestrating a scheme to set up fraudulent social media accounts about Counterclaimant, Counterclaim-Defendants publicly disclosed information or material to knowingly portray Counterclaimant in a false light.

82.     In particular, Counterclaim-Defendant Miles Cooley coordinated on behalf of Freedman Taitelman, & Cooley, LLP and Counter-Defendant Jane Doe to hire third parties to establish fraudulent social media accounts with false allegations to obtain additional money for Jane Doe she is not entitled to. Defendant Freedman was aware of the scheme and is named herein as a co-conspirator. The use of social media accounts to spread false allegations was not legitimately related to Jane Doe's claim and is not protected by the litigation privilege.

83.     The Law Firm Defendants acted outside of the course of legal representation and in violation of the California Rules of Professional Responsibility and did not conduct the above scheme as part of any legitimate litigation.

84.     The false light created by the disclosure would be highly offensive to a reasonable person in Counterclaimant's position.

85.     Jane Doe and Law Firm Defendants knew the disclosure would create a false impression about Lanng, and did it to have a "lasting effect on [Lanng's] ability to do business" or, alternatively, acted with reckless disregard of the truth.

86.     Counterclaim-Defendants were negligent in determining the truth of the information published on social media accounts they ordered published or whether a false impression would be created by its disclosure and publication.

87.     Counterclaimant was harmed and sustained harm to his "ability to do business" and reputation as a result of Counterclaim-Defendants' conduct. Counterclaim-Defendants' conduct was a substantial factor in causing Counterclaimant's harm.

88.     Lanng has suffered damages in an amount according to proof at trial, plus interest, as well as costs and attorneys' fees, all totaling no less than $40 million.

/ / /

/ / /

/ / /

/ / /

## **FIFTH CLAIM FOR RELIEF**

### **DEFAMATION**

**(Against Counterclaim-Defendants Jane Doe and the Law Firm Defendants)**

89.     Counterclaimant incorporates by reference and re-alleges each of the preceding paragraphs as if fully set forth fully herein.

90.     On behalf of and in concert with Jane Doe and Law Firm Defendants, Counterclaim Defendant Bryan Freedman made a statement in April of 2024 to Finans, a Danish media outlet, after the filing of the Countercomplaint. Freedman stated that Countercomplainant "sexually abused and victimized Jane, an employee, for years and then did not pay a dime in settlement proceeds under the agreement that he signed. He was fired from Tradeshift in part for this very breach of contract …"

91.     At the time he made the statement, Freedman knew that the statements were false. Freedman was aware that Lanng and Doe's relationship was consensual, not abusive, and lasted only a few months, not years. Freedman was aware that Lanng had paid Doe under the settlement. Freedman was aware that Lanng's termination from Tradeshift was not due to a breach of the settlement agreement.

92.     These statements caused damage to Lanng's reputation and professional prospects as Lanng was the CEO and co-founder of a unicorn status technology company originally from Denmark.

93.     Freedman made the statements to cause harm to Lanng's ability to do business.

94.     Lanng has suffered damages in an amount according to proof at trial, plus interest, as well as costs and attorneys' fees.

### **PRAYER FOR RELIEF**

WHEREFORE, Counterclaimant prays for judgment against Counterclaim-Defendants as follows:

1.     For an order of compensatory, special, consequential and incidental damages caused by the conduct of Counterclaim-Defendants in an amount to be

1  proved at trial;

2       2.      For an order of exemplary and punitive damages according to proof at

3  trial;

4       3.      For the full amount of Counterclaimant's attorney's fees and costs

5  incurred;

6       4.      For punitive damages; and

7       5.      Any other relief the Court may deem appropriate.

8

9  DATED: April 16, 2024                          FROST LLP

10

11                                      By:  _____

12                                           CHRISTOPHER FROST

13                                           JEFFERY BOGERT
                                             NICHOLAS LAUBER

14                                           Attorneys for Defendant/Counterclaimant
                                             Christian Lanng

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>DEMAND FOR JURY TRIAL</u>

Defendant/Counterclaimant Christian Lanng hereby demands a jury trial for
its claims against Defendant.

DATED:  April 15, 2024                          FROST LLP

                                      By: _____
                                          CHRISTOPHER FROST
                                          JEFFERY BOGERT
                                          NICHOLAS LAUBER
                                          Attorneys for Defendant/Counterclaimant
                                          Christian Lanng

# EXHIBIT A

# CONFIDENTIAL SETTLEMENT AND
# MUTUAL RELEASE AGREEMENT

This Confidential Settlement and Mutual Release Agreement ("**Agreement**") for personal injury claims is entered into by and between ███████████ ███ ("███ on the one hand, and Christian Lanng ("**Lanng**"), on the other hand. ████ and Lanng are each a "Party" and are collectively "the Parties."

## RECITALS

**WHEREAS**, certain disputes have arisen between ████ and Lanng arising out of their personal relationship and not their employment with Tradeshift, Inc.;

**WHEREAS**, ████ has not filed any claim, civil action, or administrative complaint regarding, referencing, or in any way relating to Lanng or her employment with Tradeshift;

**WHEREAS**, Lanng denies all wrongdoing and liability;

**WHEREAS**, without any admission of wrongdoing or liability, and subject to the terms of this Agreement, the Parties now wish to forever terminate, compromise, discharge and settle all disputes and claims between them, known and unknown, suspected or unsuspected, based on any facts occurring from the beginning of time through and including the Effective Date (defined below).

**NOW, THEREFORE,** in consideration of the foregoing recitals and the mutual promises and covenants set forth herein, the Parties agree as follows:

## AGREEMENT

1. <u>Incorporation of Recitals.  The above recitals are incorporated herein by reference.</u>

2. <u>Effective Date</u>.

    2.1    Subject to the provisions of Section 2.2, below, this Agreement shall become effective (the "**Effective Date**") when signed by all Parties.

    2.2    If Lanng fails to make the Holding Payment (defined below) or the First Settlement Payment (defined below), both Parties shall be released from all of their obligations and restrictions under this Agreement and the Parties' rights, claims, and obligations shall be the same as if this Agreement was never signed, the sole exception being Lanng's entitlement to a credit upon payment of the Holding Payment (defined below) as set forth in Section 3.3 below.

11311-00001/13388000.2

████ initials

Lanng initials

1

3.      Holding Payment.

      3.1      Within nine days of the Effective Date, Lanng may pay ███ the non-refundable amount of $250,000 (the "**Holding Payment**") which shall be paid in cash to an account to be identified by ███.

      3.2      If Lanng fails to make the Holding Payment, both Parties shall be released from all of their obligations and restrictions under this Agreement and the Parties' rights, claims, and obligations shall be the same as if this Agreement was never signed.  For the avoidance of doubt, if Lanng fails to make the Holding Payment, ███ may not bring a claim on account of such failure (but may bring any other claim).

      3.3      If Lanng makes the Holding Payment, but thereafter fails to make the First Settlement Payment (defined below) set forth in Section 4.1 the Holding Payment, together with interest thereon at the 1 Year Treasury Rate in effect at the Effective Date, shall be credited to any future obligation of Lanng to ███ whether by settlement, judgment, arbitration award or otherwise.

4.      Settlement Payment.  Subject to the terms of this Agreement, the total amount to be paid by Lanng to ███ is USD $10 million (the "**Settlement Payment**"), to be paid as follows:

      4.1      Within 90 days of the Effective Date, Lanng may pay ███ $4,750,000 (the "**First Settlement Payment**") in cash to an account identified by ███.

         a.      If Lanng fails to make the First Settlement Payment, both Parties shall be released from all of their obligations and restrictions under this Agreement and the Parties' rights, claims, and obligations shall be the same as if this Agreement was never signed. For the avoidance of doubt, if Lanng fails to make the First Settlement Payment, ███ may not bring a claim on account of such failure (but may bring any other claim).

         b.      If Lanng makes the First Settlement Payment, he shall be bound and obligated the pay the Second Settlement Payment (defined below) and the Final Settlement Payment (defined below) to ███.

      4.2      Provided that ███ is not in breach of any provision of this Agreement, within 180 days of the Effective Date, Lanng shall pay ███ $2,500,000 (the "**Second Settlement Payment**") in cash to an account identified by ███.

      4.3      Provided that ███ is not in breach of any provision of this Agreement, within 365 days of the Effective Date, Lanng shall pay ███ $2,500,000 (the "**Final Settlement Payment**") in cash to an account identified by ███.

      4.4      All payments are to be made to:

11311-00001/13388000.2

                                                  _____
                                                  ███ initials

                                                  _____
                                                  Lanng initials

Werksman Jackson & Quinn LLP Client Trust Account

Union Bank
Pasadena Branch
70 South Lake Avenue
Pasadena, California 91101 USA
(626) 683-5500

ABA Routing No.  122000496
Account No.  ███████████

SWIFT Code:  █████████████

5.      <u>Release by</u> ██████     Except as to the obligations created by this Agreement, upon the Effective Date, ██████ on her own behalf and on behalf of each of her past and present agents, attorneys, employees, contractors, officers, directors, representatives, partners, spouses, joint venturers, partnerships, corporations, companies, predecessors-in-interest, administrators, executors, heirs, successors, assigns, and all others claiming by or through any of the foregoing (collectively, the "██████ **Releasors**"), hereby releases unconditionally, and is hereby deemed to release unconditionally, Lanng and each of his past and present agents, attorneys, employees, contractors, officers, directors, representatives, investors, partners, spouses, partnerships, companies, predecessors-in-interest, administrators, executors, heirs, successors, assigns, and Tradeshift, Inc., and its current and former affiliates, successors, assigns, agents, representatives, creditors, shareholders, investors, attorneys, directors, officers, and employees, all of which are third-party beneficiaries to this Agreement entitled to enforce its terms, and all others against whom the ██████ Releasors, or any of them, could make a claim (collectively the "**Lanng Releasees**"), from any and all ██████ Claims (as defined below).  "██████ Claims" for the purpose of this Section 5 include, but are not limited to, any and all manner of action or actions, cause or causes of action, in law or in equity or before any administrative agency, suits, debts, liens, contracts, agreements, promises, liability, claims, demands, damages, injuries, loss, cost or expense, of any nature whatsoever, known or unknown, fixed or contingent, apparent or concealed, suspected or unsuspected, arising in tort, contract, or otherwise, which the ██████ Releasors now have or may hereafter have against the Lanng Releasees, or any of them, and whether existing in the past or the present or the future, based upon any conduct or event occurring up through and including the Effective Date.

6.      <u>Release by Lanng</u>.  Except as to the obligations created by this Agreement, upon the Effective Date, Lanng on his own behalf and on behalf of each of his past and present agents, attorneys, employees, representatives, partners, spouses, joint venturers, partnerships, corporations, companies, predecessors-in-interest, administrators, executors, heirs, successors, assigns, and all others claiming by or through any of the foregoing (collectively, the "**Lanng Releasors**"), hereby releases unconditionally, and is hereby deemed to release unconditionally, ██████ and each of her past and present agents, attorneys, employees, representatives, investors, partners, spouses, partnerships, corporations, companies, predecessors-in-interest, administrators,

██████ initials

Lanng initials

executors, heirs, successors, assigns, and all others against whom the Lanng Releasors, or any of them, could make a claim (collectively the "███ **Releasees**"), from any and all Lanng Claims (as defined below).  "Lanng Claims" for the purpose of this Section 6 include, but are not limited to, any and all manner of action or actions, cause or causes of action, in law or in equity or before any administrative agency, suits, debts, liens, contracts, agreements, promises, liability, claims, demands, damages, injuries, loss, cost or expense, of any nature whatsoever, known or unknown, fixed or contingent, apparent or concealed, suspected or unsuspected, arising in tort, contract, or otherwise, which the Lanng Releasors now have or may hereafter have against the ███ Releasees, or any of them, and whether existing in the past or the present or the future, based upon any conduct or event occurring up through and including the Effective Date.

7.      <u>Covenant Not to Sue</u>.  The Parties shall not file, or cause to be filed, any suit, administrative proceeding or arbitration demand, or otherwise assert a claim or complaint against one another, the Lanng Releasees or the ███ Releasees on account of any released claim.  Moreover, ███ shall not file, or cause to be filed, any suit, administrative proceeding or arbitration demand, or otherwise assert a claim or complaint against the Lanng Releasees for any failure by Lanng to make the Holding Payment or the First Settlement Payment.  In the event of a breach of this covenant not to sue, this Agreement shall constitute a complete and absolute defense to such claim.

8.      <u>Waiver of California Civil Code Section 1542</u>

8.1      In releasing the ███ Claims and the Lanng Claims released above, each Party specifically waives any benefit of the provisions of Section 1542 of the California Civil Code, which provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

8.2      Each Party hereby knowingly and voluntarily waives any right that she/he may have under Section 1542 of the California Civil Code or any similar provision of the statutory or non-statutory law of California or any other jurisdiction, to the full extent that she/he may lawfully waive all such rights and benefits pertaining to the matters released above.

9.      <u>Arbitration</u>

9.1      Any controversy, dispute, or claim arising out of, in connection with, or related to the interpretation, performance or breach of this Agreement or any agreement or other instrument executed pursuant hereto or otherwise arising out of the execution of any of the

11311-00001/13388000.2

_____
███ initials

_____
Lanng initials

4

foregoing, including, without limitation, any claim based on contract, tort, or statute, shall be resolved or determined, exclusively by confidential arbitration conducted in or around San Francisco or Los Angeles, California, before a single arbitrator (the "**Arbitrator**") and in accordance with the then-existing JAMS Comprehensive Rules.  The Arbitrator's award will be final, binding and non-appealable, and judgment may be entered by any State or Federal court having jurisdiction thereof.  The arbitrator shall be required to decide the controversy in accordance with applicable substantive law, however, the Arbitrator shall not have the power to invalidate this Agreement or any part thereof and any Award to that effect will be outside of the powers of the Arbitrator.  Any controversy concerning whether a dispute is an arbitrable dispute or as to the interpretation or enforceability of this Section 9.1 shall be determined by the Arbitrator.  The Arbitrator shall be a retired or former judge.  All arbitration proceedings shall be held in the strictest of confidence and all parties and counsel shall be bound by such requirement of confidentiality.  Pursuant to Section 1283.1(b) of the California Code of Civil Procedure, the provisions of Section 1283.05 of the California Code of Civil Procedure  (which permit discovery) are incorporated into, made a part of, and made applicable to this agreement to arbitrate.  The Parties intend that in any arbitration, third party discovery shall be permitted to the fullest extent permitted by law.  The Parties intend that this agreement to arbitrate be valid, enforceable and irrevocable.  The designation of a situs or a governing law for this Agreement or the arbitration shall not be deemed an election to preclude application of the Federal Arbitration Act, if it would be applicable.

9.2     The Parties expressly acknowledge and agree that the arbitration agreement set forth in Section 9.1 is a material inducement for the Parties to enter into this Agreement.  In the event ███ or Lanng breaches her or his obligation to arbitrate by filing a public lawsuit without leave of the Arbitrator as provided in Section 9.3, the non-breaching Party may bring a claim in arbitration and obtain damages resulting from the breach according to proof.  The Parties are aware of the holding in *Sargon Enterprises, Inc. v. Browne George Ross, LLP*, 15 Cal.App.5th 749 (2017) and expressly agree to waive its holding and that of any similar authority so that the Arbitrator may award damages as provided herein.  The Parties waive any argument and agree not to assert that it would be against public policy to waive the holding in *Sargon*.  The remedies in this Section shall be in addition to, and shall not limit, any other remedies available to the Parties, whether under this Agreement or otherwise.

9.3     No Party shall file any action in any court (including to confirm or vacate any award) naming any other Party without prior leave from the Arbitrator, which may be granted for good cause shown.  The Arbitrator shall condition such relief by requiring redactions, filing under seal or such other protections to afford maximum confidentiality to the Parties and their dispute.

9.4     Each of the Parties irrevocably consents to the personal jurisdiction of the courts located in the State of California and agrees that any arbitration demand filed pursuant to this Agreement, or any other legal process, may be served upon her or him or pursuant to Section 16 of this Agreement.

11311-00001/13388000.2

███ initials

Lanng initials

9.5      In any arbitration alleging a breach of the terms of this Agreement, or otherwise arising out of or relating to this Agreement, the prevailing Party shall be entitled to recover reasonable attorneys' fees and costs, as well as the expenses of the arbitrator and expert witnesses.

9.6      The parties agree that, in addition the other provisions in this Section 9, any arbitration asserting a breach of any of Sections 10 (No Prior Disclosure), 11 (Confidentiality), 12 (Non-Disparagement) and 13 (No Further Communications) of this Agreement (together, the "**Privacy Provisions**") shall be conducted on an expedited basis, with a decision to be rendered by the arbitrator no later than 60 days after initiation of the arbitration unless otherwise agreed to in writing by the Parties.  The Parties agree that, after consulting with the arbitrator as to the specific expedited procedures to be applied, the arbitrator shall apply any and all such procedures as he or she shall determine, regardless of whether those procedures differ from what the JAMS Rules would otherwise require.

10.     <u>No Prior Disclosure of Confidential Information</u>.  ▇▇▇ and Lanng, on their own behalf and on behalf of their agents, attorneys, employees, contractors, officers, directors, representatives,  partners, spouses, joint venturers, partnerships, companies, predecessors-in-interest, administrators, executors, heirs, successors, and assigns, ▇▇▇ counsel, Werksman Jackson & Quinn, and Lanng's counsel, Quinn Emanuel Urquhart & Sullivan, represent and warrant that other than disclosure to Van Dermyden Makus, ▇▇▇ treating physicians, Gert Sylvest, Mikkel Hippe Brun, Ian Swycher, Cem Usakli, Jeff Ransdell, Roberto Aitkenhead, Noriaki Akubo, Takateru Murakami, Stephan Chandler, Russell Joseph, Robert Wilger, Melissa Hollatz, Melinda Douglas, Katherine Henderson, Marissa Mattson, Anthony Lorenz, Bre Pettis, Calvin Chin, Cameron Sinclair, David Cowan, Diane Gaspar, Doug Stromback, Elizabeth Heller, Henry Grossman, Jillian Manus, John Manulis, John Burbank, Kelly Leonard, Kim Polman, Mohit Burman, Nabil Nuaim, Peter Bisanz, Peter Smith, Helen Ly, Rick Stromback Samantha Stein, Saverio La Francesca, and the directors, officers and employees of Tradeshift and its counsel, neither they nor anyone affiliated with them has previously disclosed in any manner, whether directly or indirectly, in form or substance, to any third person not a Party hereto: (a) the fact of or amount of the Settlement Payment or Holding Payment; (b) any term of this Agreement; (c) any communication between ▇▇▇ and Lanng, whether written or oral; (d) any photograph, video or other image of Lanng; or (e) any allegation by ▇▇▇ of any alleged tort, crime, misconduct, or other wrongdoing by Lanng, or conduct by ▇▇▇ while employed by Tradeshift, Inc., all of which are collectively the "**Confidential Information**."

11.     <u>Confidentiality</u>

11.1     Except as otherwise specifically provided for in Section 10 or this Section 10 (the "**Confidentiality Clause**"), ▇▇▇ and Lanng, on their own behalf and on behalf of their agents, attorneys, employees, contractors, officers, directors, representatives, partners, spouses, joint venturers, partnerships, companies, predecessors-in-interest, administrators, executors, heirs, successors and assigns, ▇▇▇ counsel, Werksman Jackson & Quinn, and Lanng's counsel, Quinn Emanuel Urquhart & Sullivan, agree not to disclose to any person or

11311-00001/13388000.2

▇▇▇ initials

Lanng initials

entity that is not a Party to this Agreement: (a) any of the Confidential Information; (b) any information, document, material, correspondence, or communication that is in any way related to any aspect of the Parties' relationship; or (c) any other non-public information about either party that the other reasonably should know is private or confidential.  In the event of a breach of this Confidentiality Clause by a third party on whose behalf ███ or Lanng has agreed (e.g., their attorneys), ███ or Lanng shall be liable as if she or he breached the confidentiality restrictions herself or himself.  Nothing in this Section 11 shall prevent ███ or Lanng, or their counsel or representatives from providing truthful testimony compelled by subpoena in any proceeding or pursuant to an internal investigation by Tradeshift and its attorneys.

11.2     ███ or Lanng may disclose only the Settlement Amount to her or his tax preparer and, only as necessary, in her or his tax returns filed with a governmental entity or otherwise permitted by this Agreement.

11.3     Nothing in this Section 11 shall apply to any disclosure by ███ Lanng or their respective counsel or representatives reasonably necessitated by: (a) any applicable statutes, laws, rules or regulations; (b) an order duly issued by a court of competent jurisdiction; or (c) the arbitration contemplated by Section 9 of this Agreement.

11.4     In the event any Party receives a subpoena or other process purporting to require disclosure of the Agreement or any of its terms, such Party shall provide notice to the other within three (3) business days in the manner provided in Section 16.

11.5     Nothing in this Agreement shall prevent or restrict Tradeshift, Inc., from making legally or contractually required disclosures regarding the disputes and the settlement of the disputes.

_____
███ initials

_____
Lanng initials

12.    <u>Non-Disparagement</u>. ███ and Lanng, on their own behalf and on behalf of their agents, attorneys, employees, contractors, officers, directors, representatives, partners, spouses, joint venturers, partnerships, corporations, companies, predecessors-in-interest, administrators, executors, heirs, successors and assigns, ███ counsel, Werksman Jackson & Quinn, and Lanng's counsel, Quinn Emanuel Urquhart & Sullivan, agree not to make, publish, or disseminate any statement, written or verbal, through any means (including electronic, print, broadcast media, social media, the internet or otherwise), or instigate, assist or participate in the making of any statement, written or verbal, that would defame, disparage (whether or not such disparagement legally constitutes libel or slander), suggest wrongdoing on the part of, or place in a negative light the personal or business reputation, practices, or conduct of Lanng or ███ their businesses, or their families, irrespective of the truthfulness or falsity of such remarks.  Nothing in this Section 12 shall prevent ███ or Lanng, or their counsel or representatives from providing truthful testimony compelled by subpoena in any proceeding or pursuant to an internal investigation by Tradeshift and its attorneys.

13.    <u>No Further Communications</u>

13.1    ███ and Lanng agree to, without exception, cease all intentional communications and/or contact with each other related to any subject whatsoever, either directly or indirectly, in any way, including but not limited to, in person, by telephone, mail, e-mail, text message, social media or other electronic means.

13.2    In the event of any breach or alleged breach of any term of this Agreement, any communications relating to any such breach or alleged breach shall be made only by and through the Parties' counsel in the manner provided in Section 16 of this Agreement.

14.    <u>Injunctive Relief</u>.  The Parties agree that a breach of the Confidentiality, Non-Disparagement Clause, and No Further Communications clauses of Sections 11, 12, and 13 would cause irreparable injury for which money damages would be inadequate.  In the event of a breach or threatened breach of any of Sections 11, 12, or 13, without limiting any of his other remedies at law or in equity, Lanng and ███ shall also be entitled to seek injunctive relief, without bond, enjoining ███ or Lanng from any future breach.

15.    <u>Liquidated Damages</u>

15.1    The Parties acknowledge that Lanng and ███ specifically bargained for the Privacy Provisions and, without the inclusion of those provisions in this Agreement, they would not have entered into this Agreement or paid any portion of the Settlement Payment nor agreed to be bound by any of its other terms.  The recitals in this Section 15 are intended to be conclusive, irrefutable and incontestable under California Evidence Code Section 622.

15.2    The Parties agree that any breach by ███ or Lanng of any of the Privacy Provisions shall be considered a material breach of this Agreement.  The Parties agree that it would be impractical, extremely inconvenient and difficult to affix the actual damage

11311-00001/13388000.2

███ initials

Lanng initials

caused by ███ or Lanng's breach of any of the Privacy Provisions and that such breach will cause serious and irreparable damage to Lanng or ███ Therefore, pursuant to California Civil Code Section 1671, the Parties agree that, in the event of a breach of any of the Privacy Provisions, Lanng and/or ███ shall be entitled to liquidated damages as set forth in this Section 15, which the Parties agree represents a fair estimate of the reasonable compensation for damages that would flow from such breaches and is not a penalty.

       15.3     If the arbitrator concludes that ███ or Lanng breached any of the Privacy Provisions, the breaching party shall be liable to the other for liquidated damages as follows:

       a.     A breach by ███ of Section 10 (No Prior Disclosure of Confidential Information) or Section 11 (Confidentiality), shall require her to forfeit and return to Lanng the Settlement Amount paid to her under this Agreement.  The Parties acknowledge, agree and shall not contest that the return of all consideration paid under this Agreement for such a breach or breaches bears a reasonable relationship to Lanng's actual damages because Lanng entered into this Agreement in reliance on Section 10 and he entered into this Agreement with an expectation that ███ would honor her obligations under Section 11.  A breach by Lanng of Section 9 or Section 10, which breach has been found to have been committed by an arbitrator in and award confirmed by an appropriate court, shall release ███ from all obligations under this Agreement;

       b.     In addition, a breach by ███ or Lanng of Section 12 (Non-Disparagement) or Section 13 (No Further Communications) shall require the breaching Party to pay the other Party $100,000 per breach.  For purposes of assessing liquidated damages, each disparaging remark, communication or contact shall constitute a separate breach for purposes of assessing liquidated damages.  By way of example only, two text messages from ███ to Lanng or Lanng to ███ in violation of Section 13 shall constitute two breaches and thus require payment by the breaching party of $200,000 to the other.  ███ and Lanng acknowledge, agree and shall not contest that the sum of $100,000 per breach bears a reasonable relationship to Lanng's and ███ actual damages because of Lanng's and ███ position in the business community, their ability to generate income based in part on their reputation, and the value the Parties place on ceasing communications between the Parties..

       15.4     Any award of liquidated damages shall be paid within 30 days of the arbitrator's determination of a breach giving rise thereto.

_____
███ initials

_____
Lanng initials

16.    <u>Notice</u>.  Notice to the Parties shall be effective when sent, given in writing and delivered by both email and U.S. Mail as follows:

      16.1    If to █████

          Hon. Halim Dhanidina (Ret.)
          Werksman Jackson & Quinn
          888 West Sixth Street, Fourth Floor
          Los Angeles, CA 90017
          hdhanidina@werksmanjackson.com

      16.2    If to Lanng:

          Diane M. Doolittle
          Quinn Emanuel Urquhart & Sullivan, LLP
          555 Twin Dolphin Drive, 5th Floor
          Redwood Shores, California 94065
          dianedoolittle@quinnemanuel.com

          and

          Bruce E. Van Dalsem
          Quinn Emanuel Urquhart & Sullivan, LLP
          865 S. Figueroa Street, 10th Floor
          Los Angeles, California 90017
          brucevandalsem@quinnemanuel.com

      16.3    The Parties may amend the persons and addresses to which notice shall be given by written notice given in accordance with this Section.

17.    <u>Continued Cooperation</u>.  █████ and Lanng agree to reasonably and in good faith cooperate and to execute any and all supplementary documents and to take all additional actions that may be necessary or appropriate to give full force to the basic terms and intent of this Agreement and which are not inconsistent with its terms.

18.    <u>Acknowledgment of Waiver of Claims under ADEA</u>.  The Parties understand and acknowledge that they are waiving and releasing any rights they may have under the Age Discrimination in Employment Act of 1967 ("ADEA"), and that this waiver and release is knowing and voluntary.  The Parties understand and agree that this waiver and release does not apply to any rights or claims that may arise under the ADEA after the Effective Date of this Agreement.  The Parties further understand and acknowledge that they have been advised by this writing that: (a) they should consult with an attorney prior to executing this Agreement; (b) they have twenty-one (21) days within which to consider this Agreement; (c) they have seven (7) days following their individual execution of this Agreement to revoke this Agreement; (d) notice of revocation by either Party must be in writing and delivered timely to the other Party as specified

11311-00001/13388000.2

                                  _____  ████ initials

                                  _____  Lanng initials

in Section 16; (e) this Agreement shall not be effective until after the revocation period has expired; and (f) nothing in this Agreement prevents or precludes a Party from challenging or seeking a determination in good faith of the validity of this waiver under the ADEA, nor does it impose any condition precedent, penalties, or costs for doing so, unless specifically authorized by federal law.  In the event a Party signs this Agreement in less than the 21-day period identified above, the Party hereby acknowledges that the Party has freely and voluntarily chosen to waive the time period allotted for considering this Agreement.

19.     <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of California without regard to California's choice of law rules.

20.     <u>General Provisions.</u>

20.1     <u>Time of the Essence</u>.  Time is of the essence with respect to the Parties' performance of their obligations under this Agreement

20.2     <u>Full Satisfaction</u>.  This Agreement, and the rights and benefits provided by it, are acknowledged by the Parties to be in full and complete settlement and satisfaction of the claims that are released.

20.3     <u>Authority</u>.  Each person and entity executing this Agreement has full capacity, power, and authority to do so, and all necessary resolutions and authorizations have been obtained.

20.4     <u>Tax Liability</u>.  Each Party is responsible for any and all tax liability that may result from this Agreement and no Party makes any representations or warranties concerning the tax consequences or liabilities resulting from or arising from this Agreement.  However, Lanng shall not issue a tax form 1099-MISC with respect to the damages paid under this Agreement.

20.5     <u>Integration</u>.  This Agreement contains the entire and only understanding between the Parties and supersedes any and all prior and/or contemporaneous oral or written negotiations, agreements, representations, and understandings.  The Parties, and each of them, represent and agree that no promise, statement (oral or written, express or implied), or inducement has been made that caused them to sign this Agreement, other than those expressly set forth in this Agreement.  Any and all representations that any Party considers to be material to its decision to enter into this Agreement have been included in this Agreement and each Party agrees that any alleged representation not included in this Agreement was not material to his or its decision to enter into this Agreement.  This Agreement shall be accepted as conclusive proof that: (1) any reliance by any Party on any alleged representation not included in this Agreement shall not be justified; and (2) any fact allegedly not disclosed was not material to each Party's decision to execute this Agreement.  Each Party further agrees that no other Party owes an obligation to disclose any fact or, if such obligation exists, each Party relieves the other Parties of

11311-00001/13388000.2

_____  ████ initials

_____
11                          Lanng initials

such obligation.  In any action where any Party contends that any other Party has made any representation, or failed to disclose any fact, and such contention is inconsistent with this paragraph, the court, arbitrator, or other tribunal shall summarily dismiss any such claim, even if the applicable law would not support such summary dismissal absent this clause.

20.6     Modification.  This Agreement may not be altered, amended, or extinguished except by a writing that expressly refers to this Agreement and is signed subsequent to the date of this instrument by duly authorized representatives of the respective Parties.

20.7     Successors.  This Agreement shall be binding upon and inure to the benefit of the executors, administrators, heirs and successors.  This Agreement shall not be assigned.

20.8     Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Signatures by facsimile shall be of the same force and effect as if in original ink.

20.9     Headings.  The headings and captions used in this Agreement are for convenience only and shall not be deemed to affect in any way the language of the provisions to which they refer.

20.10    Interpretation.  This Agreement shall be interpreted as if jointly drafted by the Parties, and no provision shall be interpreted against any Party because such provision was drafted by that Party.  In the event of a dispute regarding the meaning of this Agreement, or any term of this Agreement, drafts of the Agreement and communications concerning such drafts shall be inadmissible for any purpose including, without limitation, to aid in the interpretation of this Agreement.

20.11    Severability.  If any provision of this Agreement shall be held to be illegal, invalid, or unenforceable, the Court or arbitrator shall modify and interpret such provision to permit its enforcement in a manner most closely representing the intentions of the Parties as expressed herein and the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

20.12    Waiver.  Waiver of any one breach of any provision hereof shall not be deemed to be a waiver of any other breach of the same or any other provision hereof.  The failure of any Party at any time to demand strict performance of this Agreement shall not be deemed a waiver thereof, and each Party may at any time demand strict and complete performance of this Agreement.

20.13    No Admission of Wrongdoing.  Nothing contained herein shall be taken or construed to be an admission of wrongdoing or liability of any kind on the part of either Party and both Parties expressly deny any wrongdoing or liability.

11311-00001/13388000.2

_____ initials

_____
Lanng initials

20.14     Ownership of Claims.  Each Party represents and warrants that he or she has not assigned or transferred, or purported to assign or transfer, any cause of action, claim for relief, or other matter released under the Agreement.

20.15     Costs and Expenses.  Except as otherwise specifically provided in Section 9.5 of this Agreement, the Parties shall each bear their own legal and other costs and expenses incurred in connection with the assertion of claims against any of the Parties, and all settlement negotiations leading to this Agreement.

20.16     Voluntary Execution of Agreement.  The Parties respectively represent and warrant:

20.17     This Agreement is made without reliance upon any inducement, statement, promise, or representation of any kind (oral or written, express or implied) other than those contained within this Agreement, and without reliance on any omission, non-disclosure, or failure to disclose information of any type whatsoever;

20.18     This Agreement is executed voluntarily and without any duress or undue influence on the part or behalf of the parties hereto, with the full intent of releasing all claims;

20.19     The Parties have read and understood this Agreement;

20.20     The Parties have been represented by counsel in the preparation, negotiation, and execution of this Agreement;

20.21     The Parties have been advised by their counsel as to the legal effect of each of the provisions of this Agreement.

20.22     The Parties understand the terms and consequences of this Agreement, the releases it contains and the waiver it contains of California Civil Code Section 1542; and

20.23     The Parties are fully aware of the legal and binding effect of this Agreement.

11311-00001/13388000.2

_____  ▮ initials

_____
Lanng initials

he

IN WITNESS WHEREOF, the Parties have approved and executed this Agreement on the date set forth opposite their respective signatures.

Dated: May ___, 2022                          ███████████████████ ████ ___

Dated: May ___, 2022                          _____
                                              CHRISTIAN LANNG

11311-00001/13388000.2

                                              _____ ████ initials

                                              _____ Lanng initials

14

# EXHIBIT B

**DRAFT**
**NOT BINDING UNTIL SIGNED**

## FIRST AMENDMENT TO CONFIDENTIAL SETTLEMENT AND MUTUAL RELEASE AGREEMENT

This First Amendment to the Confidential Settlement and Mutual Release Agreement (the "**Amendment**") is entered into by and between ████████████ ███ ("███ on the one hand, and Christian Lanng ("**Lanng**"), on the other hand.

### RECITALS

**WHEREAS**, ████ and Lang entered into that certain Confidential Settlement and Mutual Release Agreement (the "**Agreement**"), effective May 14, 2022;

**NOW, THEREFORE,** Lanng and ████ agree as follows:

### AGREEMENT

1.      Amendments to Agreement.  The Agreement is hereby amended as follows:

        1.1      Section 4.1, Section 4.1(a), and Section 4.1(b) are amended and replaced, in their entirety, as follows:

"On or before January 9, 2023, Lanng shall pay ████ $4,750,000 (the '**First Settlement Payment**') in cash to an account identified by ████

        1.2      Section 4.2 is amended and replaced, in its entirety, as follows:

"Provided that ████ is not in breach of any provision of this Agreement, within 60 days of the First Settlement Payment, Lanng shall pay ████ $2,500,000 (the '**Second Settlement Payment**') in cash to an account identified by ████

        1.3      Section 4.3 is amended and replaced, in its entirety, as follows:

"Provided that ████ is not in breach of any provision of this Agreement, within 185 days of the Second Settlement Payment, Lanng shall pay ████ $2,500,000 (the '**Final Settlement Payment**') in cash to an account identified by ████

2.      Extension Payment.  Within five days of ████ execution of this Amendment, Lanng will pay ████ the nonrefundable amount of $175,000 (the "**Extension Payment**") which shall be paid in cash to an account identified by ████ This Extension Payment is in addition to, and shall not be credited against, the Settlement Payment;

        2.1      If Lanng fails to make the Extension Payment, both Parties shall be released from all of their obligations and restrictions under this Amendment and the Parties' rights, claims, and obligations shall be the same as if this Amendment was never signed.



_____ initials

_____ Lanng initials

1

DocuSign Envelope ID: 182A41A5-A53C-4765-A761-6B38E5AAF4B9

**DRAFT**
**NOT BINDING UNTIL SIGNED**

3.     Reaffirmation of No Prior Disclosure of Confidential Information:  ██  and Lanng, on their own behalf and on behalf of their agents, attorneys, employees, contractors, officers, directors, representatives, partners, spouses, joint venturers, partnerships, companies, predecessors-in interest, administrators, executors, heirs, successors, and assigns, ██ counsel, Werksman Jackson & Quinn, and Lanng's counsel, Quinn Emanuel Urquhart & Sullivan, reaffirm, represent, and warrant that the representations and warranties regarding Confidential Information set forth in Section 10 of the Agreement continue to be true and accurate.

4.     Defined Terms. Capitalized terms used but not defined herein shall have the same meanings given them in the Agreement.

5.     No Other Amendment; Conflict.  Except as set forth in this Amendment, the Agreement is unchanged and, as so amended, the Agreement shall remain in full force. If the provisions of this Amendment conflict with the provisions of the Agreement, then the provisions of this Amendment shall prevail.

6.     Counterparts.  This Amendment may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Signatures by facsimile shall be of the same force and effect as if in original ink.

IN WITNESS WHEREOF, the Parties have approved and executed this Agreement on the date set forth opposite their respective signatures.

09 / 12 / 2022
Dated: September __, 2022

9/12/2022
Dated: September__, 2022

DocuSigned by:
*Christian Lanng*
6B6D9B1C60E0478
CHRISTIAN LANNG



__ initials

Lanng initials

2

Doc ID: 5e63ba9b483ff4e571570dac7259abb17048449f

 **HELLOSIGN**

Audit Trail

| | |
|---|---|
| **TITLE** | Extension Agreement .doc.pdf |
| **FILE NAME** | Extension%20Agreement%20.doc.pdf |
| **DOCUMENT ID** | 5e63ba9b483ff4e571570dac7259abb17048449f |
| **AUDIT TRAIL DATE FORMAT** | MM / DD / YYYY |
| **STATUS** | ● Signed |

This document was requested from app.clio.com

## Document History

| | | |
|---|---|---|
| **SENT** | **09 / 12 / 2022**<br>20:57:46 UTC | Sent for signature to ▓▓▓▓▓ ▓▓▓ (teamallymartina@gmail.com) from jruiz@werksmanjackson.com<br>IP: 52.25.182.204 |
| **VIEWED** | **09 / 12 / 2022**<br>21:42:13 UTC | Viewed by ▓▓▓▓ ▓▓ ▓▓▓▓▓▓▓▓<br>IP: 47.154.22.247 |
| **SIGNED** | **09 / 12 / 2022**<br>21:43:48 UTC | Signed by ▓▓▓▓ ▓▓ ▓▓▓▓▓▓▓▓<br>IP: 47.154.22.247 |
| **COMPLETED** | **09 / 12 / 2022**<br>21:43:48 UTC | The document has been completed. |