CHRISTOPHER FROST (SBN 200336)
chris@frostllp.com
JEFFREY BOGERT (SBN 132778)
jeff@frostllp.com
NICK LAUBER (SBN 288499)
Nick@frostllp.com
FROST LLP
10960 Wilshire Boulevard, Suite 2100
Los Angeles, California 90024
Telephone: (424) 254-0441
Facsimile: (424) 600-8504

Attorneys for Defendant/Counterclaimant
Christian Lanng

UNITED STATES DISTRICT COURT

CALIFORNIA NORTHERN DISTRICT (OAKLAND)

| | |
|---|---|
| JANE DOE,<br><br>              Plaintiff,<br><br>       vs.<br><br>TRADESHIFT, INC., et al.<br><br>              Defendant.<br>_____<br><br>CHRISTIAN LANNG,<br><br>              Counterclaimant,<br><br>       vs.<br><br>JANE DOE; BRYAN J. FREEDMAN; MILES COOLEY and FREEDMAN, TAITELMAN, & COOLEY, LLP; and DOES 1 through 10, inclusive,<br><br>              Counterdefendant. | Case No. 4:24-cv-00166-JST<br><br>*Judge Jon S. Tigar*<br><br>**DEFENDANT/COUNTER CLAIMANT CHRISTIAN LANNG'S OPPOSITION TO ANTI-SLAPP**<br><br>Trial Date:          None Set |

1
2

# **TABLE OF CONTENTS**

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ............................................. 1

I. INTRODUCTION ............................................................................................ 1

II. STATEMENT OF FACTS ............................................................................. 2

III. Legal Standard .............................................................................................. 6

IV. The Anti-SLAPP Motion Must Be Denied as to Breach of Contract .............. 9

    A. The Litigation Privilege is Inapplicable to Breach of Contract ............ 9

    B. Lanng Can Show a Probability of Prevailing on the Breach of
    Contract Claim ................................................................................... 11

V. The Lawyer Defendants Cannot Satisfy the First Prong of Anti-SLAPP ....... 14

    A. Freedman's Extortionate Demands in Violation of the Rules of
    Professional Conduct Are Not Protected Activity ................................ 14

    B. Litigation Through the Media is Not Protected Activity ...................... 18

    C. Lanng's Romantic Life is Not a Matter of Public Interest .................. 20

        1. Lanng is Not a Public Figure ........................................................ 20

        2. Even if Lanng were a Public Figure, the Statements about
        him do not concern a Public Issue. ............................................... 21

VI. Lanng's Is Likely to Prevail on his Intentional Infliction of Emotional
Distress, False Light, and Defamation Claims ................................................. 22

    A. Freedman's Engaged in Outrageous Conduct on TMZ ...................... 22

    B. There Is Sufficient Evidence to Show Cooley Created Social
    Media Accounts to Spread Misinformation ......................................... 23

    C. There is Sufficient Evidence Freedman Made False Defamatory
    Statements to Finans Magazine ......................................................... 24

VII. CONCLUSION .............................................................................................. 25

24
25
26
27
28

1

# TABLE OF AUTHORITIES

2

**Cases**                                                                          **Page(s)**

3

*Abuemeira v. Stephens*,
4
    246 Cal. App. 4th 1291 (2016)..................................................................19

5

*Alfasigma USA, Inc. v. First Databank, Inc.*,
6
    398 F. Supp. 3d 578 (N.D. Cal. 2019)........................................................7

7

*Badie v. Bank of America*,
8
    67 Cal. App. 4th 779 (1998)......................................................................11

9

*Baral v. Schnitt*,
    1 Cal. 5th 376 (Cal. 2016) ..........................................................................6
10

11

*Brown v. Grimes*,
    192 Cal. App. 4th 265 (2011)....................................................................11
12

*Citizens of Humanity, LLC v. Hass*,
13
    46 Cal. App. 5th 589 (Cal. Ct. App. 2020).............................................7, 8

14

*Cohen v. Brown*
15
    173 Cal. App. 4th 302 (2009)....................................................................15

16

*Commonwealth Energy Corp. v. Investor Data Exchange, Inc.*,
17
    110 Cal. App. 4th 26 (2003).......................................................................20

18

*Empress LLC v. City & County of San Francisco*,
19
    419 F.3d 1052 (9th Cir. 2005) .....................................................................8

20

*Flatley v. Mauro*,
21
    39 Cal. 4th 299 (2006)....................................................14, 15, 16, 17

22

*Fresno Canal & Irrigation Co. v. Perrin*,
    170 Cal. 411 (1915) ...................................................................................12
23

24

*Jordan-Benel v. Universal City Studios, Inc.*,
    859 F.3d 1184 (9th Cir. 2017) .....................................................................7
25

26

*Lawyer Disciplinary Process v. Artimez*,
    540 S.E.2d 156 (W. Va. 2000) ..................................................................22

27

*Mindys Cosmetics, Inc. v. Dakar*,
28
    611 F.3d 590 (9th Cir. 2010) .......................................................................6

*Navallier v. Sletten,*
   106 Cal. App.4th 763 (2003) ........................................................................ 9, 10

*Nygard, Inc. v. Uusi-Kerttula*
   159 Cal.App.4th 1027 (2008) ...................................................................... 21, 22

*Oasis W. Realty, LLC v. Goldman,*
   51 Cal. 4th 811 (Cal. 2011) ............................................................................... 6

*Paulus v. Bob Lynch Ford, Inc.,*
   139 Cal. App. 4th 659 (2006) ............................................................................ 8

*Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP,*
   133 Cal. App. 4th 658 (Cal. Ct. App. 2005) ...................................................... 7

*Pollock v. Superior Court,*
   229 Cal. App. 3d 26 (1991) ............................................................................... 9

*Rand Res., LLC v. City of Carson,*
   6 Cal. 5th 610 (Cal. 2019) ................................................................................. 7

*Rothman v. Jackson,*
   49 Cal.App.4th 1134 (1996) ........................................................................ 18, 19

*Rusheen v. Cohen et al.,*
   37 Cal. 4th 1048 (2006) ..................................................................................... 9

*Silberg v. Anderson,*
   50 Cal.3d 205 (1990) ....................................................................................... 18

*Thomas v. Fry's, Elecs., Inc.,*
   400 F.3d 1206 (9th Cir. 2005) (per curiam) ...................................................... 8

*Verdier v. Verdier,*
   133 Cal. App. 2d 325 (1955) ........................................................................... 11

*Verizon, Inc. v. Covad Communs. Co.,*
   377 F.3d 1081 (9th Cir. 2004) ........................................................................... 8

*Weinberg v. Feisel,*
   110 Cal. App. 4th 1122 (2003) ........................................................................ 20

*Wentland et al. v. Wass et al.,*
   126 Cal. App. 4th 1484 (2005) .................................................................... 9, 10

*Younger v. Solomon*,
    38 Cal. App. 3d 289 (1974) ..................................................................... 19


**Statutes**

California Civil Code § 1636 ....................................................................... 12

California Civil Code § 1644 ....................................................................... 11

California Civil Procedure Code § 425.16 ...........................................6, 7, 14, 16, 18

California Evidince Code § 622 ................................................................... 13

California Penal Code § 518 ........................................................................ 14

California Penal Code § 519 ........................................................................ 14

California Code of Civil Procedure § 1001(d) ............................................ 14

California Government Code § 12964.5 ...................................................... 13

Federal Rule Civil Procedure 8(a) ............................................................... 8

Federal Rule Civil Procedure 56 ............................................................... 7, 8


**Other Authorities**

California Rule of Professional Conduct 4.3 ............................................. 17

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Counterclaimant Christian Lanng filed his countercomplaint after Plaintiff Jane Doe and her legal team of Bryan Freedman, Miles Cooley, and Freedman, Taitelman, + Cooley, LLP (collectively hereinafter "Lawyer Defendants") engaged in a calculated misuse and abuse of the legal system to extort and defame Lanng, breaching a prior settlement. Doe secured a large settlement from Lanng, leveraging his fiduciary obligations as the CEO of Tradeshift, Inc., and his need to avoid a scandal that would jeopardize a major investment in Tradeshift. After Doe extracted the settlement, she employed Lawyer Defendants who utilized both traditional and social media to antagonize and besmirch Lanng, aiming to accelerate payments to Doe and to extract additional funds from Tradeshift.

Doe and Lawyer Defendants now seek to shield their actions under anti-SLAPP protections, claiming that their conduct is protected and Lanng cannot substantiate his claim. However, Doe and Lawyer Defendants claims are factually and legally bereft. A counterclaim for breach of a settlement of released claims and agreement to arbitrate is beyond the scope of anti-SLAPP protections. Furthermore, Doe unequivocally intended to be bound by the Settlement Agreement, without conditioning performance on Lanng making the "First Settlement Payment." Attorney misconduct does not warrant anti-SLAPP protection, nor does conducting litigation through the media, which is not a form of public participation that anti-SLAPP statutes are designed to protect. Relatedly, Lawyer Defendants cannot be afforded public interest protections when the only public interest arises from their own machinations and media manipulation. Lastly, Lanng is likely to prevail on all of his claims, supported by documentary evidence, despite having conducted minimal discovery. Because Doe and Lawyer Defendants were not engaging in protected activity and separately because Lanng is likely to prevail on his claims, the anti-SLAPP motion should be denied.

## II.    <u>STATEMENT OF FACTS</u>

Lanng was the founder and CEO of Tradeshift, Inc., a company specializing in technology for managing supply chains and global trade. Declaration of Christian Lanng ("Lanng Decl."), ¶2. Lanng began a romantic relationship with Jane Doe in early 2014 and soon after hired her as his assistant at Tradeshift. Lanng Decl., ¶3. During their relationship, Lanng and Doe consensually engaged in BDSM practices. Lanng Decl., ¶4. As part of these activities, Doe obtained a "Slave Contract" from a website, which she then modified with handwritten notes and later typed out. Lanng Decl., ¶4-5.  The "Slave Contract" functioned as a prop for their BDSM practices, documenting their mutual consent and safety protocols. Lanng Decl., ¶5.

Additionally, Doe maintained a personal diary and granted access to Lanng. Lanng Decl., ¶6.  In her diary, Doe expressed her affection for Lanng, detailing their consensual sexual relationship with comments such as "im so soft i love christian i feel so warm and happy and cuddly" (Ex. 2 at 00051), "Christian might be the best man I've ever met" (Id. at 00047), "so i'm very touched and I hope i give him the same affections" (Id. at 00036), and "sex was really good with christian tonight" (Id. at 00005). Doe also made comments indicating that their BDSM practice was consensual role-playing such as "i wish i had ropes and christian now to sleep with" (Id. at 00006), "I'm his baby and queen and monkey and goddess partner and slave and all his and he takes me and I really feel that he and I are a special thing," (Id. at 00032) and "I'm also very much his sex slave lol" (Id. at 00053). Doe included diary entries which indicated that her physical and emotional safety was assured such as "I wondered if christian would be able to do that to be with the ropes or if it too much of a safety hazard maybe just in a loving way like the first time he tied me" (Id. at 00008) and "i'm calling a red day." (Id. at 00048.)

Lanng and Doe ended their relationship in 2014, but Doe continued to work at Tradeshift in various roles until 2020. Lanng Decl., ¶7. Amid the COVID-19 pandemic, Tradeshift laid off many non-essential employees, including Doe. Lanng

Decl., ¶8. Upon receiving notice of her termination, Doe began alleging abuse and mistreatment by her supervisors to Tradeshift's human resources department. Lanng Decl., ¶9. She eventually escalated her claims to include false allegations of sexual misconduct by Lanng, denying the consensual nature of their romantic involvement and BDSM practices, and fabricating accusations of sex trafficking. Lanng Decl., ¶9. This led to a prolonged dispute between Doe and Tradeshift regarding her false allegations against Lanng.

During this time, Lanng was negotiating a major capital investment in Tradeshift from HSBC. Lanng Decl., ¶10. Given Doe's threats to publicize salacious details of their romantic involvement along with her false accusations, Lanng was compelled to enter into a $10 million settlement agreement (the "Settlement Agreement") with her. Lanng Decl., ¶11. This step was necessary to prevent Tradeshift from potentially losing a significantly larger amount if the HSBC investment fell through. Id.

Tradeshift was not a party to the Settlement Agreement, which was explicitly unrelated to Doe's employment. See Ex. 1 to the Declaration of Jane Doe in support of Special Motion to Strike ("Doe Decl."), Recitals. The Settlement Agreement released all of Doe's claims against Lanng and included a clause preventing Doe from disclosing any private details about Lanng, clearly referencing their romantic relationship and BDSM practices. Id at ¶5 and ¶11.1. The Settlement Agreement also included an arbitration provision requiring confidential arbitration for any disputes arising from the settlement. Id at ¶9.1 Additionally, it stipulated that no party could file any action in court against the other without an arbitrator's approval. Id at ¶9.3. Given the salacious and atypical nature of BDSM practices, even consensual conduct would, if publicized, generate significant negative attention and potentially jeopardize the HSBC investment. The Settlement Agreement did not prohibit Doe from disclosing criminal conduct, though this was irrelevant as Lanng and Doe's interactions were entirely consensual. Id. The initial Settlement

1  Agreement specified that if Lanng failed to make the First Settlement Payment, both
2  parties would be released from their obligations. Id at ¶2.2 and ¶4.1(a).

3      Given the size of the settlement and the pending HSBC investment, Lanng's
4  ability to pay the settlement depended on HSBC purchasing his stock. Lanng Decl.
5  at ¶12. The settlement was structured with an initial payment of $250,000, followed
6  by a "First Settlement Payment" scheduled after the anticipated HSBC investment
7  date. Id. and Ex. 1 to Doe Decl. at ¶3.1 and ¶4.1. Due to entirely unrelated
8  circumstances, the HSBC investment was delayed multiple times. Lanng Decl. at
9  ¶13. Consequently, Doe and Lanng entered into multiple agreements to amend the
10 settlement, allowing Lanng to make payments after the HSBC investment occurred.
11 Id. With each amendment, Lanng made an additional extension payment to Doe. See
12 Ex. 2, Ex. 3, and Ex. 4 to Doe Decl. The First Amendment to the Settlement
13 Agreement removed language from Section 4(a)(1) that stated failure to make the
14 First Settlement Payment would release all parties from their obligations under the
15 settlement agreement. See Ex. 2 to Doe Decl. at ¶1.1. The Second Amendment to
16 the Settlement Agreement removed Section 2.2, which included similar language.
17 See Ex. 3 to Doe Decl. at ¶1.1.

18     After the Third Amendment to Settlement Agreement, Doe hired Lawyer
19 Defendants, who asserted that the settlement was invalid and demanded immediate
20 full payment of $10 million. See Declaration of Bryan Freedman in support of
21 Special Motion to Strike ("Freedman Decl."). Following these demands, Freedman
22 appeared on TMZ, where he showcased an enlarged copy of the "Slave Contract"
23 with all names redacted. Lanng Decl. at ¶14. Any person familiar with the "Slave
24 Contract," including Lanng, would have recognized it. See Declaration of Jeffrey A.
25 Payne in support of Special Motion to Strike at ¶5 for video link. Although
26 Freedman was on the show to discuss claims against NBC and Bravo, during the
27 interview, he was asked if an NBC executive was involved with the "Slave
28 Contract," to which he neither confirmed or denied. Id.

In light of the potential media attention from Doe and Freedman while the HSBC deal was pending, Tradeshift terminated Lanng, leaving him without legal representation. Lanng Decl. at ¶15.  Freedman immediately contacted Lanng via text message, stating that a major media outlet was ready to interview Lanng about the allegations and referencing Lanng "throwing away" his future. Lanng Decl. at ¶15, Ex. 6 to Freedman Decl.  Lanng responded that he would have a new attorney reach out to Freedman but emphasized that media attention would not be helpful. Id. Freedman continued to communicate directly with Lanng, stating that a $10 million payment would prevent a filing and avoid media attention. Id. Lanng explained that he had no assets. Id. Freedman persisted, stating the situation would have lasting impact on Lanng's ability to do business and causing him permanent destruction. Id. Later, Freedman counseled Lanng to take action against Tradeshift to secure resources for both Lanng and Doe. Declaration of Nicholas Lauber at ¶2, Ex. 5 at FTC 000008.

At some point, Lawyer Defendants approached Diana Smith to see if she would be interested in making claims against Lanng. Declaration of Diana Smith ("Smith Decl.") at ¶2.  Miles Cooley revealed to Smith, in a WhatsApp message, a progress report from a social media consultant hired by Lawyer Defendants. Smith Decl. at ¶3, Ex. 1.  The consultant, under their direction, had created a Twitter account posing as a character claiming to be a victim of sexual abuse allegedly perpetrated by Lanng. See id. and Lanng Decl. at ¶17, Ex. 3 at p. 2. Starting in late September 2023, this account posted numerous statements about Lanng, his termination from Tradeshift, and the "Slave Contract." Lanng Decl. at ¶17, Ex. 3. The Twitter account engaged with numerous articles about Tradeshift, repeating its fictional allegations against Lanng. Id. Subsequently, on October 10, 2023, Tradeshift issued a press release stating that Lanng had been terminated due to allegations of sexual misconduct. Lanng Decl. at ¶16.  The Twitter Account encouraged others to come forward and urged social media users to contact

1  Freedman. Lanng Decl. at ¶17, Ex. 3 at p. 2 and p. 9.The social media consultant

2  also mentioned plans to "troll" Tradeshift friendly forums on Reddit and to create a

3  website with ad buys targeting Lanng. Smith Decl. ¶3, Ex. 1. The consultant stated

4  that the intent was to "fuck this guy up," referring to Lanng. Id.

5      Lanng alerted Freedman to the Twitter account, but Freedman denied any

6  knowledge of the account. Lauber Decl. at ¶2, Ex. 5 at FTC000013. Subsequently,

7  in December 2023, Freedman filed the initial complaint in this matter on behalf of

8  Doe. In doing so, Freedman failed to properly redact Smith's name from the original

9  complaint, thereby publicizing it. Lanng brought his counterclaims in April 2024.

10  When contacted for comment on Lanng's counterclaims by Finans, a Danish media

11  outlet, Freedman stated that Lanng had never paid Doe a dime. See Lanng Decl. at

12  ¶18, Ex. 4. Finans then reached out to Lanng for a response to Freedman's

13  comment, prompting Lanng to file his amended countercomplaint.

14  **III.   Legal Standard**

15      A defendant may strike plaintiff's complaint if the allegations arise out of

16  "protected conduct." Cal. Code Civ. Proc. § 425.16. Anti-SLAPP does not provide

17  blanket immunity from suit; rather, it "only provides a procedure for weeding out, at

18  an early stage, meritless claims arising from protected activity." *Baral v. Schnitt*, 1

19  Cal. 5th 376, 384 (Cal. 2016). "Only a cause of action that satisfies both prongs of

20  the anti-SLAPP statute - i.e., that arises from protected speech or petitioning and

21  lacks even minimal merit - is a SLAPP, subject to being stricken under the statute."

22  *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 820 (Cal. 2011) (quoting

23  *Navellier v. Sletten*, 29 Cal. 4th 82, 89 (Cal. 2002)).

24      Anti-SLAPP motions are subject to a two-step analysis with shifting burdens.

25  First, the moving party must make a prima facie showing that the claims arise from

26  an "act in furtherance of [their] right of petition or free speech." Cal. Civ. Proc.

27  Code § 425.16(e); *Mindys Cosmetics, Inc. v. Dakar*, 611 F.3d 590, 595 (9th Cir.

28  2010). "The California Court of Appeal has interpreted the anti-SLAPP statute's

'arising from' language to mean that a claim is based on whatever conduct constitutes the 'specific act[] of wrongdoing' that gives rise to the claim." *Jordan-Benel v. Universal City Studios, Inc.*, 859 F.3d 1184, 1190 (9th Cir. 2017) (alteration in original) (quoting *Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP*, 133 Cal. App. 4th 658, 671 (Cal. Ct. App. 2005)). "Put another way, a court focuses its anti-SLAPP analysis on the specific conduct that the claim is challenging." *Id.* (citing *Wang v. Wal-Mart Real Estate Bus. Tr.*, 153 Cal. App. 4th 790, 809 (Cal. Ct. App. 2007)). To determine the gravamen of Lanng's claims, the Court "must examine the allegedly wrongful conduct itself, without particular heed to the form of action within which it has been framed." *Peregrine Funding*, 133 Cal. App. 4th at 671. In the first step of the anti-SLAPP analysis, the court must look at two issues: "first, what conduct or statements underlie [counterclaimants'] claims; and second, whether the conduct was 'in furtherance of' [the moving party's] rights of petition or free speech 'in connection with a public issue' " *Rand Res., LLC v. City of Carson*, 6 Cal. 5th 610, 622 (Cal. 2019).

If the Doe and Lawyer Defendants make this showing, the burden shifts to Lanng to show "a probability that the [he] will prevail on the [challenged] claim." Cal. Code Civ. Proc. § 425.16(b)(1). California courts describe this second step as a "summary-judgment-like procedure." *Citizens of Humanity, LLC v. Hass*, 46 Cal. App. 5th 589, 598 (Cal. Ct. App. 2020). However, anti-SLAPP's burden-shifting and "probability" standard of proof are inconsistent with FRCP 12 and 56.2 The Ninth Circuit has attempted to harmonize anti-SLAPP with the Federal Rules.

Thus, to survive an anti-SLAPP motion requires "only a minimum level of legal sufficiency and triability." *Alfasigma USA, Inc. v. First Databank, Inc.*, 398 F.Supp.3d 578, 585 (N.D. Cal. 2019) (internal quotes omitted). The Court's inquiry is limited to whether the counterclaimant has made "a prima facie showing" sufficient to sustain "a favorable judgment." *Citizens of Humanity*, 46 Cal. App. 5th at 598. It "accept[s plaintiff's] evidence as true and do[es] not weigh evidence or

resolve conflicting factual claims[,] evaluat[ing the defendant's] showings only to determine if they defeat [plaintiff's] claim as a matter of law." *Id.* "Claims with minimal merit proceed." *Id.* (internal quotations omitted).

The heightened pleading standard based on California cases stating that an individual bringing a suit challenged under the anti-SLAPP statute "may not rely solely on its complaint, even if verified; instead, its proof must be made upon competent admissible evidence" does not apply in Federal Court because such a state standard directly conflicts with the Federal Rules of Civil Procedure. *Paulus v. Bob Lynch Ford, Inc*., 139 Cal. App. 4th 659, 673 (2006). The Ninth Circuit Court of Appeals has held that "federal courts may not impose a heightened pleading requirement in derogation of federal notice pleading rules." *See Thomas v. Fry's, Elecs., Inc.*, 400 F.3d 1206, 1207 (9th Cir. 2005) (per curiam). Requiring Lanng to produce additional evidence to support his allegations would conflict with the notice-pleading requirement of Rule of Civil Procedure 8(a). *See also Empress LLC v. City & County of San Francisco*, 419 F.3d 1052, 1056 (9th Cir. 2005) (holding that "a heightened pleading standard should only be applied when the Federal Rules of Civil Procedure so require"); *see Verizon, Inc. v. Covad Communs. Co*., 377 F.3d 1081, 1091 (9th Cir. 2004) (holding that "[p]rocedural state laws are not used in federal court if to do so would result in a direct collision with a Federal Rule of Civil Procedure" and noting that federal courts have "accordingly refused to apply certain discovery-limiting provisions of the anti-SLAPP statute because they would conflict with Fed. R. Civ. P. 56"). Thus, Lanng is not held to a heightened pleading standard on his counterclaims, can rely on his countercomplaint and supporting declarations to establish that he has alleged valid claims against Doe and Lawyer Defendants, and their factual disputes hold no weight.

///

///

///

IV.     **The Anti-SLAPP Motion Must Be Denied as to Breach of Contract**

A.      **The Litigation Privilege is Inapplicable to Breach of Contract**

The California Supreme Court in *Rusheen v. Cohen et al*., 37 Cal. 4th 1048, 1057 (2006), described the development of the litigation privilege, describing that, "the privilege recognized in section 47 derives from common law principles establishing a defense to the tort of defamation." (citing *Oren Royal Oaks Venture v. Greenberg, Bernhard, Weiss & Karma, Inc.*, 42 Cal. 3d 1157, 1163 (1986)). The Court further stated that while the privilege originally only applied to defamation, "the privilege is now held applicable to any communication, whether or not it amounts to a publication [citations], and all torts except malicious prosecution." *Id*.

The litigation privilege does not apply to breach of contract cases. *Wentland et al. v. Wass et al*., 126 Cal. App. 4th 1484, 1487 (2005). In *Wentland*, the court held that "the policies behind the litigation privilege are not furthered by applying the privilege in this breach of contract case." The litigation in *Wentland* arose out of partnership agreements whereby the parties executed a contract that barred the defendants from *making* accusations or comments that alleged wrongdoing by plaintiff. *Id*. at 1488. Plaintiff alleged that the defendants breached the agreement, and the defendants asserted protection under the litigation privilege. *Id*. at 1490. The court, relying on *Navallier v. Sletten*, 106 Cal. App. 4th 763 (2003), found that the litigation privilege should not apply in this breach of contract case because "[j]ust as one who validly contracts not to speak waives the protection of the anti-SLAPP statute (citations omitted), so too has he waived the protection of the litigation privilege. The litigation privilege has never shielded one from all liability." *Id*. at 1494. The court further held that "[u]nlike in the usual derivative tort action, application of the privilege in the instant case does not serve to promote access to the courts, truthful testimony, or zealous advocacy" nor does it "encourage finality and avoid litigation." *Id*.

The *Wentland* court also distinguished *Pollock v. Superior Court*, 229 Cal.

App. 3d 26 (1991), which Lawyer Defendants cite in their motion. *See Wentland*, 126 Cal. App. 4th at 1494. The *Wentland* court stated that in *Pollack*, the cause of action was based on allegedly wrongful conduct in the litigation process, whereas in *Wentland* the conduct was based on a separate breach of promise independent of the litigation and involved "wrongful conduct or performance under the contract. . . ." *Id*. at 1494. Lanng's breach of contract claim addresses separate breaches, namely the breach of the covenant not to sue and the obligation to not file a complaint without an arbitrator's permission. The Settlement Agreement was a contract to avoid litigation and resolve any future disputes through confidential arbitration.

Furthermore, the California Court of Appeal declined to extend the litigation privilege to apply to a breach of contract action in *Navallier et al. v. Sletten*, 106 Cal. App. 4th 763 (2003). The court explained that the "privilege is generally described as one that precludes liability in tort, not liability for breach of contract." *Id*. at 773. In *Navallier*, the plaintiff filed a fraud and breach of contract claim against defendant alleging that he misrepresented his intention to be bound by a release he executed and that he breached his release by pursuing federal counterclaims. *Id*. at 768. The court cited a previous California Supreme Court decision involving the same case, stating that a " 'defendant who in fact has validly contracted not to speak or petition has in effect 'waived' the right to the anti-SLAPP statute's protection in the event he or she later breaches that contract.' " *Id*. at 774 (citing *Navallier v. Sletten*, 29 Cal. 4th 82, 94 (2002)).

The terms of the Settlement Agreement were drafted to resolve all disputes between Lanng and Doe. Specifically, the Settlement Agreement included a release of all claims and a covenant not to sue, effectively waiving Doe's rights to anti-SLAPP and litigation privilege protection in the event of a breach of contract. Allowing anti-SLAPP relief or litigation privilege protection in actions to enforce a settlement agreement would undermine the very purpose of such agreements. No party would ever have an incentive to settle disputes if settlements could not prevent

1   the opposing party from immediately initiating litigation on the settled claims.

2        **B.**     **Lanng Can Show a Probability of Prevailing on the Breach of**

3             **Contract Claim**

4        Doe's argument that Lanng's non-payment of the "First Settlement Payment"

5   excuses her from all obligations under the Settlement Agreement fails under basic

6   contract law. Breach of an independent covenant in a contract does not excuse the

7   performance of another independent covenant. *Verdier v. Verdier*, 133 Cal.App.2d

8   325, 334 (1955). "To construe covenants as dependent is to work a forfeiture as to

9   one party, and no obligation of a contract is to be regarded as a condition precedent

10  unless made so by express terms or necessary implication." *Id*. at 334. To excuse the

11  other party's performance, the two obligations must be dependent, meaning that the

12  parties specifically bargained that the failure to perform the one relieves the

13  obligation to perform the other. *Brown v. Grimes*, 192 Cal.App.4th 265, 277-279

14  (2011). "The determination of whether a promise is an independent covenant, so that

15  breach of that promise by one party does not excuse performance by the other party,

16  is based on the intention of the parties as deduced from the agreement." *Id*. at 279.

17       Here, the initial Settlement Agreement explicitly stated that all of Doe's

18  obligations were contingent upon Lanng's payment of the "First Settlement

19  Payment" as outlined in Sections 2.2 and 4.1(a). Both sections specified that if

20  Lanng failed to make this payment, all parties would be released from their

21  obligations and restrictions, treating the Settlement Agreement as if it never existed.

22  However, the First Amendment to the Settlement Agreement removed this

23  obligation from Section 4.1(a), and the Second Amendment deleted Section 2.2

24  entirely. Thus, Doe's agreed and intended that her obligations under the Settlement

25  Agreement were no longer dependent on Lanng's payment of the "First Settlement

26  Payment" as the bargained for amendments specifically removed the condition.

27       The words of a contract are understood in their ordinary and popular sense.

28  Cal. Civ. Code §  1644, *Badie v. Bank of America*, 67 Cal.App.4th 779 (1998).

Additionally, a contract must be interpreted to give effect to the mutual intention of the parties as it existed at the time of contracting, as far as this intention is ascertainable and lawful. Cal. Civ. Code § 1636. Thus, by specifically removing the clause that conditioned all obligations under the Settlement Agreement upon Lanng's payment of the First Settlement Payment, Doe and Lanng clearly intended to be bound by the Settlement Agreement without further conditioning their obligations on the payment of the First Settlement Payment.

Importantly, Lanng had already paid several hundred thousand dollars to Doe through the Initial Payment and the Extension Payments of all three amendments. These payments were made in exchange for something significant, at the very least, the agreement to resolve all disputes through private, confidential arbitration without any public filing of a complaint unless authorized by an arbitrator. Additionally, Doe traded her potential tort and employment statute claims for express contractual claims, which would be simpler to litigate and could potentially incur no cost due to the fee-shifting provision in the Settlement Agreement.

Furthermore, covenants in a contract that are to be performed at different times, are deemed to be independent, not dependent. *Fresno Canal & Irrigation Co. v. Perrin* 170 Cal. 411, 416 (1915) ["Where the covenants of the respective parties are to be performed at different times they are held to be independent and the breach by one party of his covenant does not excuse the performance by the other of his covenant or relieve him of liability for damages for a breach thereof."]. Here, Doe's obligations to release all claims, adhere to the covenant not to sue on those claims, and resolve any disputes exclusively through private arbitration became fully effective, at the latest, upon entering into the Second Amendment to the Settlement Agreement on January 11, 2023. This amendment removed the condition requiring Lanng to make the First Settlement Payment for these obligations to apply. Meanwhile, Lanng's obligation to make the First Settlement Payment did not become due until June 19, 2023, as specified in the Third Amendment to the

Settlement Agreement. Thus, the requirements for resolving all disputes through private arbitration, refraining from public complaints, and Doe's release of claims were all independent of Lanng's obligation to make the First Settlement Payment.

Accordingly, Doe's contractual obligations under the Settlement Agreement are not excused by Lanng's non-payment of the First Settlement Payment. Doe received substantial consideration for her obligations to use private arbitration, refrain from filing a complaint, and not pursue the released claims. This consideration included the Holding Payment, multiple Extension Payments, and a contractual claim for $10 million. The Settlement Agreement required Doe to pursue private arbitration for any breach of contract and prohibited her from pursuing the released claims in open court. By pursuing the released claims in open court, Doe breached the Settlement Agreement, and Lanng is likely to prevail on his breach of contract claim.

Lastly, Doe's assertion that the contract is illegal is not supported in law. California Government Code section 12964.5 does not apply to the Settlement Agreement. The Settlement Agreement explicitly states in the recitals that it is not related to Doe's employment. Recitals should be treated as conclusively true between the parties. *See* Cal. Evid. Code § 622. Because the Settlement Agreement does not pertain to Doe's employment, Tradeshift is not a party to it, and it only resolves claims Doe has against Lanng, section 12964.5 is inapplicable. Furthermore, the Settlement Agreement does not prevent Doe from disclosing unlawful acts; it prohibits her from disclosing private matters, specifically her consensual sexual practices with Lanng. Their BDSM practice was consensual, as evidenced by Doe signing the "Slave Contract." She further acknowledged the consensual nature of their relationship numerous times in her diary, her enjoyment of BDSM practices, and her use of safety measures outlined in the "Slave Contract" for her well-being. See Ex. 2. Accordingly, the Settlement Agreement did not aim to prevent Doe from disclosing illegal conduct, but rather to stop her from disclosing

details of their legal, consensual sexual relationship. Thus, California Code of Civil Procedure §1001(d) is inapplicable. The Settlement Agreement was legal and valid, and Lanng is likely to prevail on his breach of contract claim.

## V.   The Lawyer Defendants Cannot Satisfy the First Prong of Anti-SLAPP

### A.   Freedman's Extortionate Demands in Violation of the Rules of Professional Conduct Are Not Protected Activity

The California Supreme Court has held that extortionate demands are not protected by the anti-SLAPP statute. *Flatley v. Mauro*, 39 Cal. 4th 299, 305 (2006) ("section 425.16 cannot be invoked by a defendant whose assertedly protected activity is illegal as a matter of law"). In *Flatley*, a demand letter sent by an attorney accused the entertainer Michael Flatley of sexually assaulting his client and demanded that Flatley pay a settlement or face the prospect that his personal tax and financial information would be filed in publicly available documents. *Id*. Coupled with the threat of court filings that would make personal financial information public, the demand stated "[w]e are positive the media worldwide will enjoy what they find." *Id*. at 330. The court noted that this comment made the threat more than a mere threat to make the accusation publicly, showing that Mauro was threatening to disclose the information directly to the media. The court held that the attorney's conduct constituted extortion under California law. *Id*. at 333; *see also* Cal. Penal Code §§ 518-19. The court noted "[e]xtortion is not a constitutionally protected form of speech." *Id.* at 328. The court held that the "purpose of the anti-SLAPP statute, of course, is to protect 'the valid exercise of the constitutional rights of speech and petition for the redress of grievances.' " *Id*; citing 425.16. Because the conduct targeted by the plaintiff's complaint was illegal as a matter of law, the Supreme Court affirmed the denial of the defendant's motion to strike. *Flatley*, 39 Cal. 4th at 305.

California appellate courts have consistently denied anti-SLAPP motions in cases involving illegal behavior with far less egregious facts than those presented in

*Flatley*. In *Stenehjem*, 226 Cal.App.4th at 1419, the California Court of Appeals held that a pre-litigation demand constituted extortion as a matter of law under Flatley because "[i]t threatened to expose [the defendant] to federal authorities for alleged violations of the False Claims Act unless he negotiated a settlement of Stenehjem's private claims." *Id*. at 1423. The court noted that "it is of no consequence that the e-mail did not specifically identify the crime of which Stenehjem intended to accuse [the defendant]" and held that, even if a communication "may not involve a threat as extreme as the one in *Flatley*, it is nonetheless extortion as a matter of law." *Id*. at 1423. "No precise or particular form of words is necessary in order to constitute a threat under the circumstances. Threats can be made by innuendo and the circumstances under which the threat is uttered and the relations between [the parties] may be taken into consideration." (citations omitted.) *Id*. at 1424. Accordingly, the court reversed the trial court's order granting the defendant's anti-SLAPP motion. *Id*.

In *Cohen v. Brown* 173 Cal. App. 4th 302, 306-07 (2009), the defendant attorney had requested the assistance of the plaintiff, another attorney, in representing a client in a personal injury matter. After a dispute arose between the two attorneys, the defendant made a written demand to the plaintiff threatening to file a complaint with the State Bar if the plaintiff refused to sign off on the client's settlement check to allow all fees to be paid to the defendant. Id. at 318, n.9 (the defendant's email stated that the State Bar would institute disciplinary proceedings unless "you respond to this e-mail that you will immediately endorse the settlement checks without condition."). The appellate court held that the plaintiff's claims for fraud, breach of contract, unfair competition, and other claims were not subject to the anti-SLAPP statute because Brown's conduct constituted extortion as a matter of law. *Id*. at 317-18.

Here, Lawyer Defendants engaged in conduct strikingly similar to that of the defendants in *Mauro*. Freedman's initial message explicitly mentioned his

discussions with a major media outlet. Freedman had already appeared on TMZ, displaying an enlarged version of the "Slave Contract" on camera and discussing it during his interview, despite the interview being about a different matter and TMZ showing no interest in Lanng. Freedman's comments about a public filing as part of the litigation process were coupled with references to media attention, clearly implying that he would attract media attention to the claims against Lanng. Lawyer Defendants were concocting a social media smear campaign against Lanng. Freedman's statement was not an offer to settle the claims as part of a legitimate pre-litigation demand, but rather a demand for $10 million to avoid a public filing and leaving open as the possibility of compelling arbitration in lieu of filing. Importantly, while Freedman was seeking payment of contractual claims, his threat was to file far more salacious and embarrassing tort claims. Furthermore, Freedman conveyed clear threats about the catastrophic reputational damage Lanng would face, stating that Lanng would be "throwing away [his] future" and warning of the "lasting effect on [his] ability to do business" and "permanent destruction." Similar to *Flatley*, Freedman's demand for payment was tied to a threat to cause Lanng massive reputational damage through media exposure, focusing on claims that had already been settled. However, unlike in *Flatley*, Freedman's threat indicated that payment would only avoid a public filing, not resolve legal claims.

Furthermore, public policy dictates the illegal conduct exception, delineated in *Flatley*, should be applied here. In *Flatley*, the court stated "section 425.16 does not apply to activity that is not in furtherance of the constitutional rights of free speech or petition and this would necessarily include illegal activity that falls outside protected speech and petition rights." *Id*. at 324. The *Flatley* Court states that the key inquiry is whether the activity purportedly in furtherance of protected speech or petition rights was illegal as a matter of law, which can be conclusively established by evidence or by the defendant's own admission. *Id*. at 320.

Here, undisputed evidence shows that Freedman's text messages were illegal

as a matter of law. As explained above, these messages constitute clear extortion, especially considering Freedman's prior appearance on TMZ, where he displayed an enlarged copy of the "Slave Contract" – a blatant threat illustrating the damage he could inflict on Lanng unless he received a $10 million payment. Additionally, Freedman, an attorney, took advantage of Lanng upon learning he was no longer represented by counsel. Despite Lanng's protestations that he would hire an attorney to speak with Freedman, Freedman continued to engage in unwelcome legal discussions directly with Lanng. Freedman's comments went beyond an offer to settle; they constituted legal advice, warning Lanng of the damage he would suffer to his business and the effects of filing a complaint. Later messages expressly counseled Lanng to take legal action against Tradeshift. See Ex. 5. During this time, Lawyers Defendants were perpetuating a social media smear campaign against Lanng, which Lanng confronted Freedman about. See Ex, 1.

The California Rule of Professional Conduct 4.3 states, "If the lawyer knows or reasonably should know that the interests of the unrepresented person are in conflict with the interests of the client, the lawyer shall not give legal advice to that person." Freedman violated this rule, compromising Lanng's interests and violating public policy. Freedman's conduct did not further the constitutional rights of free speech or petition. Accordingly, his communications with Lanng should not be protected by the anti-SLAPP statute.

While some California appellate cases have interpreted the *Flatley* anti-SLAPP exception for illegal conduct as applying only to criminal conduct, that interpretation has not been adopted by the California Supreme court nor is it binding upon federal courts. The refusal to apply the unlawful conduct exception has occurred in the context of statutory regulations. No court has said that the *Flatley* unlawful conduct exception does not apply to the Rules of Professional Conduct, nor would it. The inherent importance of ethics in the practice of law to the Constitution and justice itself is inconsistent with extending anti-SLAPP protection

1  to violations of the Rules of Professional Conduct. Public policy dictates that an

2  attorney cannot abuse the legal process and then enjoy its protection in an action

3  addressing that abuse. Certainly, such protection should not be granted at the outset

4  of a case. Addressing an abuse of justice by an attorney is not the type of strategic

5  litigation against public participation that section 425.16 was designed to dismiss

6  early. Accordingly, Lawyer Defendants cannot satisfy the first prong of 425.16 for

7  the extortion cause of action.

8  **B.    Litigation Through the Media is Not Protected Activity**

9  Lawyer Defendants statements on social media, to TMZ, and to Finans are

10  not protected by litigation privilege. Lawyer Defendants appear to argue that the

11  statements are privileged because they summarize and repeat the allegations made in

12  the litigation, but this misconstrues the litigation privilege. The litigation privilege

13  applies only if the communication is made "to achieve the objects of the litigation"

14  and has "some connection or logical relation to the action." *Silberg v. Anderson*, 50

15  Cal.3d 205, 212 (1990). Lawyer Defendants argue that these requirements are met

16  because their statements generally concern the litigation. But California courts have

17  expressly disavowed Lawyer Defendants' construction of the "logical relation"

18  requirement. *Rothman v. Jackson*, 49 Cal.App.4th 1134 (1996). The *Rothman* court

19  held that "similarity, or even identity, of subject matter is not a 'connection or

20  logical relation' between litigation and a communication which is alone sufficient to

21  trigger the litigation privilege." *Id*. Instead, "the 'connection or logical relation'

22  which a communication must bear to litigation in order for the privilege to apply, is

23  a functional connection." *Id*. "That is to say, the communicative act--be it a

24  document filed with the court, a letter between counsel or an oral statement--must

25  function as a necessary or useful step in the litigation process and must serve its

26  purposes." *Id*.

27  Courts routinely reject arguments--like Lawyer Defendants' here--that "the

28  communication's content need only be related in some way to the subject matter of

1   the litigation." *See id*. Rather, the privilege allows "uninhibited airing" of grievances

2   in court but bars the type of "public mudslinging" out of court done by Lawyer

3   Defendants. "The test 'cannot be satisfied by communications which only serve

4   interests that happen to parallel or complement a party's interests in the litigation,'

5   including vindication in the court of public opinion.' " *Sharper Image Corp.*, 425

6   F.Supp.2d at 1078 quoting *Rothman*, 49 Cal.App.4th at 1147 (emphasis added). A

7   "common factual genesis" is likewise insufficient. *Younger v. Solomon*, 38

8   Cal.App.3d 289, 301 (1974).

9        The litigation privilege protects statements made to persons with a substantial

10  interest in the litigation. It does not protect the statements made to news outlets or

11  on social media to unknown persons with no real connection to the litigation. See

12  *Abuemeira v. Stephens*, 246 Cal.App.4th 1291, 1299 (2016) ("the litigation privilege

13  does not apply to publications to the general public through the press"); *Rothman*,

14  49 Cal.App.4th at 1149 ("[s]tatements to nonparticipants in the action are generally

15  not privileged under section 47(b)," and holding that the litigation privilege should

16  not be extended to "litigating in the press").

17       Here, Freedman's appearance on TMZ was intended to address an entirely

18  separate suit. However, he brandished an enlarged copy of the "Slave Contract" to

19  intimidate and threaten Lanng. None of Freedman's statements to TMZ were made

20  in furtherance of the Doe Litigation claims or directed at an interested party; they

21  were simply statements to the media. Similarly, Freedman's remarks to Finans were

22  not made during the course of litigation but were once again statements to the

23  media. Additionally, the statements made on Twitter were not directed at an

24  interested party but were published for a general audience. See Ex. 3. Consequently,

25  the communicative acts underlying the intentional infliction of emotional distress,

26  false light, and defamation claims are not protected by the litigation privilege. Thus,

27  the anti-SLAPP motion regarding these claims must be denied.

28

**C.**   <u>**Lanng's Romantic Life is Not a Matter of Public Interest**</u>

While no statutory definition exists for what constitutes a 'public interest,' California Courts have held that there must be some attributes of the issue which make it one of public, rather than merely private, interest. *Weinberg v. Feisel*, 110 Cal.App.4th 1122 (2003). The matter must go beyond a 'mere curiosity' and must concern a "substantial number of people", a matter concerning a "relatively small, specific audience" is not a 'public interest. *Id.* citing *Hutchinson v. Proxmire*, 433 U.S. 111, 135 (1979). Further, "there should be some degree of closeness between the challenged statements and the asserted public interest; the assertion of a broad and amorphous public interest is not sufficient." *Id.* citing *Hutchinson v. Proxmire*, 443 U.S. at 135. (emphasis added). The specific language used in the speech is important when evaluating whether the speech invokes a 'public issue' not just "generalities that might be abstracted from [the speech]." *Commonwealth Energy Corp. v. Investor Data Exchange, Inc.,*110 Cal.App.4th 26, 34 (2003).

While issues of sex trafficking and sexual abuse are matters of public concern, this does not grant immunity to anyone making such accusations without facing legal consequences, nor can a party exploit the presence of sexual assault survivors on social media to gain sufficient clout to shield their blatant defamation campaign. There must be a direct connection between the statements and the public interest, beyond a broad categorical relationship. Here, there was no public interest in Lanng's personal life or his treatment of his assistant or employees until Lawyer Defendants initiated a smear campaign against him in September 2023. There is no link between these statements and a genuine public interest. Therefore, the public interest catch-all provision of the anti-SLAPP statute should not apply.

**1.**   **Lanng is Not a Public Figure**

Lanng, the founder and CEO of Tradeshift, did not garner widespread public attention despite the company achieving unicorn status. Tradeshift is not even a publicly traded company. See Lanng Decl. ¶2. The few scant articles cited by

Lawyer Defendants that predate their smear campaign either serve as introductions of Lanng, highlighting his lack of public figure status. These articles do not make Lanng a public figure. Not all CEOs are public figures, especially those of privately held companies. Public figure status should be reserved for the few individuals who are widely recognized without the need for introduction or reintroduction.

### 2. Even if Lanng were a Public Figure, the Statements about him do not concern a Public Issue.

In *Albanese*, 218 Cal.App.4th 923, the court "rejected the argument... that any statement about a person in the public eye is sufficient to meet the public interest requirement." *Id.* at 934. The court reached the same conclusion in *D.C.*: "No authority supports [defendants'] broad proposition that anything said or written about a public figure or limited public figure in a public forum involves a public issue." *D.C.*, 182 Cal.App.4th at 1226.

Here, there is no connection between the content of the statements and any public interest in Lanng. The articles cited in the anti-SLAPP motion identify Lanng as a CEO and discuss the impact of the technology he created on supply chains and global trade. None of these articles referred to Lanng's personal life or romantic involvement prior to the social media smear campaign orchestrated by Lawyer Defendants. There was no media attention mentioning any allegations of scandal, abuse, or the work environment at Tradeshift until the social media smear campaign began. Before this campaign, media coverage focused solely on technological innovation, not on Lanng's management style. The defamatory comments made by Lawyer Defendants – calling him an abuser, alleging sexual assault and trafficking, and falsely stating that he does not meet his financial obligations – had no relation to any public interest in Lanng, if such an interest even existed.

*Albanese* also limited the potentially broad misreading of one of Lawyer Defendants' main case, *Nygard, Inc. v. Uusi-Kerttula* 159 Cal.App.4th 1027 (2008). Indeed, the *Albanese* court clarified the language of its own previous ruling in

*Nygard*. *Albanese* narrowed the scope of *Nygard*, clarifying that for a statement about a celebrity to be considered a public issue, it must be closely related to a specific public controversy concerning that celebrity. *Albanese*, 218 Cal.App.4th at 935-36. *Nygard* is also distinguishable; the statements in question were about the working conditions at a Finnish tycoon's company and his renowned Bahamas residence, which were topics of interest to the Finnish public. *Nygard*, 159 Cal.App.4th at 1032-33, 1042. In contrast, interest in Lanng was confined to Tradeshift's technological innovations in global trade and supply chains, not Lanng's personal life. The media attention surrounding Lanng's termination and the allegations arose solely after the social media smear campaign orchestrated by Lawyer Defendants. Thus, this is not an issue of public interest.

**VI.**  **Lanng's Is Likely to Prevail on his Intentional Infliction of Emotional Distress, False Light, and Defamation Claims**

**A.**  **Freedman's Engaged in Outrageous Conduct on TMZ**

Unlike most defendants in intentional infliction of emotional distress cases, lawyers are bound by a professional code of ethics and can face professional discipline for violating these standards. Unlike many other professional ethics codes, the rules governing lawyers are promulgated and enforced by a state's highest court, a coequal branch of government. Consequently, lawyer disciplinary rules possess statute-like qualities that other professional codes often lack. Moreover, the specific rules in lawyer disciplinary codes are not merely technical or designed to protect the narrow interests of the legal profession. Instead, they further the administration of justice and safeguard the public's interest in an ethical legal profession. *See Lawyer Disciplinary Process v. Artimez*, 540 S.E.2d 156, 164–65 (W. Va. 2000). Attorney ethics codes impose heightened standards of conduct to protect the public interest.

Some ethical rules establish duties to non-clients that naturally form the basis of an intentional infliction of emotional distress claim. This include rules prohibiting lawyers from engaging in conduct solely intended to harass or intimidate others.

Here, Freedman used his appearance on TMZ as an opportunity to harass Lanng. Although Freedman was on TMZ to discuss claims against NBC and Bravo, neither of which are affiliated with Lanng, he took advantage of the camera time to display an enlarged copy of the "Slave Contract." Freedman knew the "Slave Contract" was irrelevant to his interview but presented it to the camera anyway. When the interviewer asked if the "Slave Contract" involved an NBC executive, Freedman neither confirmed nor denied it, stating only that it was between two people in regards to filming. At the same time, Freedman was negotiating with Lanng's attorneys about the potential public filing of a complaint referencing the "Slave Contract." By showcasing the "Slave Contract" on TMZ, Freedman was signaling to Lanng that he was prepared to publicly expose Lanng's involvement with Doe and her "Slave Contract." Thus, Freedman's conduct was outrageous, and Lanng is likely to prevail on his claim for intentional infliction of emotional distress.

**B.** **There Is Sufficient Evidence to Show Cooley Created Social Media Accounts to Spread Misinformation**

There is sufficient evidence to show that Lanng is likely to prevail on his claim of False Light Defamation. Cooley specifically hired a social media consultant and directed him to orchestrate a social media campaign against Lanng. This campaign included creating a Twitter account posing as a real person claiming to be a victim of sexual assault and trafficking by Lanng. The account interacted with advocates for survivors of sexual assault and trafficking, naming Lanng as an assailant. It also engaged publicly with multiple media outlets on Twitter, targeting tweets reporting on Tradeshift, and stated intentions to "troll" Reddit forums friendly to Tradeshift. The campaign further planned to create a website about Lanng and Tradeshift with ad buys on social media networks. The consultant explicitly stated that the intent was to "fuck this guy up," referring to Lanng.

Thus, there is evidence that the social media campaign was an intentional act directed by Cooley. The statements were made publicly on Twitter and were false,

as the account posed as a real person falsely claiming to be a victim of sexual assault by Lanng. These statements were highly offensive to a reasonable person, given their serious accusations, and the campaign's intent was clearly malicious towards Lanng. Accordingly, Lanng is likely to prevail on his False Light Defamation claim.

### C.   There is Sufficient Evidence Freedman Made False Defamatory Statements to Finans Magazine

When Finans Magazine wrote an article regarding Lanng's counterclaims, Jesper Hoberg reached out to Freedman for comment. Freedman's comment was:

> This lawsuit is an egregious and meritless attempt by Christian to deflect from the underlying issue at hand - that he sexually abused and victimized Jane, an employee, for years and then did not pay a dime in settlement proceeds under the agreement that he signed. He was fired from Tradeshift in part for this very breach of contract, a fact that he is now attempting to position as a demand for additional funds. Further, he is using this countersuit, the legal system, and the media to continue manipulating and abusing Jane by offering a narrative that is not grounded in any truth, portraying her as a consenting party in an illegal workplace relationship. This lawsuit is riddled with lies about third party sites for which no evidence is offered and bogus extortion claims and is an example of irresponsible lawyering and media manipulation.

See Ex. 4.

Freedman's comment to the media is not only false but contains an indisputably false statement that he knew to be untrue when he made it. The claim that Lanng "did not pay a dime in settlement proceeds under the agreement he signed" is patently false. Freedman was fully aware of Lanng's compliance with the Settlement Agreement. Therefore, there is sufficient evidence for Lanng's defamation claim against Freedman.

///

///

///

///

///

///

///

1

## VII.  __CONCLUSION__

2   For the foregoing reasons, Defendant/Counterclaimant respectfully requests

3   that the Court deny anti-SLAPP in its entirety.

4

5   DATED: July 22, 2024   FROST LLP

6

7

8   By: _____

9   CHRISTOPHER FROST
    JEFFREY BOGERT

10  NICHOLAS LAUBER
    Attorneys for Defendant/Counterclaimant

11  Christian Lanng

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28